L46KCELC

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          19 CR 127 (PAE)

5    LUCIO CELLI,

6              Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           April 6, 2020
9                                          2:05 p.m.

10
     Before:
11
                    HON. PAUL A. ENGELMAYER,
12
                                           District Judge
13                                         Sitting By Designation

14
                          APPEARANCES
15
     MARK J. LESKO,
16        United States Attorney for the
          Eastern District of New York
17   ANNA KARMIGIOS
     NADIA SHIHATA
18        Assistant United States Attorneys

19   BENJAMIN SILVERMAN
          Attorney for Defendant
20

21

22

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

L46KCELC

| | |
|---|---|
| 1 | (Case called) |
| 2 | MS. KARMIGIOS:  Anna Karmigios and Nadia Shihata, for |
| 3 | the government.  Good afternoon, your Honor. |
| 4 | THE COURT:  Good afternoon, Ms. Karmigios. |
| 5 | And good afternoon, Ms. Shihata. |
| 6 | MS. SHIHATA:  Good afternoon. |
| 7 | MR. SILVERMAN:  Good afternoon, your Honor.  Benjamin |
| 8 | Silverman, and seated to my left is Lucio Celli, and I believe |
| 9 | on the phone is Dorea Silverman. |
| 10 | THE DEFENDANT:  Good afternoon, your Honor. |
| 11 | THE COURT:  Very good.  Good afternoon, Mr. Silverman. |
| 12 | Good afternoon, Mr. Celli. |
| 13 | Good afternoon, by phone, to Ms. Silverman. |
| 14 | And good afternoon to anyone else who is auditing the |
| 15 | conference by phone. |
| 16 | Good afternoon, as well, to Mr. Walker, our court |
| 17 | reporter. |
| 18 | Let me begin just by acknowledging the obvious, which |
| 19 | is that we're here under the strange situation of COVID |
| 20 | conditions, and I appreciate -- first of all, I hope everyone |
| 21 | is doing well from a health perspective; second of all, I |
| 22 | appreciate the awkwardness of our being in masks.  For just a |
| 23 | quick second, I'm going to take down the mask because I think |
| 24 | Mr. Celli is entitled to see the face of the judge who is -- |
| 25 | THE DEFENDANT:  I saw you, your Honor.  Sorry. |

L46KCELC

1          THE COURT:  I'm just being gracious, sir.  I just

2     wanted you to have an opportunity to see me, so that the face

3     of justice is not masked for the entirety of this proceeding.

4     I won't speak while I have the mask down.

5          (Pause)

6          THE COURT:  And I understand that Mr. Smallman has

7     asked everybody, please, not to stand when you speak, so I'll

8     ask you to abide by that request in the interests of public

9     safety.

10          I have a handful of matters to take up.  The very

11     first one is just to put on the record the fact of everybody's

12     consent to doing today's proceeding here in the Southern

13     District, for which I am appreciative as well to everyone.

14          Mr. Silverman, I've got your email of March 31, at

15     3:05, saying that you consent to proceeding here today.  Just

16     to confirm on the record that you do?

17          MR. SILVERMAN:  Yes, your Honor.  Thank you.

18          THE COURT:  Very good.

19          And, Ms. Karmigios, I have your email of March 30th to

20     the same effect.  I take it, just to confirm, the government,

21     as well, consents to doing this here today?

22          MS. KARMIGIOS:  Yes, your Honor.

23          THE COURT:  All right.  Very good.

24          The two principal areas of business for today are my

25     resolution of the pending motions in limine and then what's

L46KCELC

1  called a *Faretta* inquiry, or an inquiry to Mr. Celli, presented

2  by the fact that, according to Mr. Silverman, Mr. Celli is

3  interested in or is exploring representing himself at trial.

4  And I'll take those in that order.

5       In connection with the motions in limine, I have a

6  handful of factual questions for counsel that may shape the

7  resolution or discussion of a couple of the motions.

8       Before I do that, though, there's just one issue that

9  I wanted to take up, and it is prompted by a statement that was

10  made, Mr. Silverman, by you in your email to counsel and the

11  Court of March the 29th, and this was in connection with

12  scheduling a conference for the purpose of exploring

13  Mr. Celli's interest in representing himself, and you write, "I

14  note that Mr. Celli states that he intends to call me as a

15  witness at trial, so it may be necessary for the Court to

16  appoint new counsel as a standby attorney."

17       Putting aside any other issue involving Mr. Celli's

18  request to represent himself, I just wanted to briefly break

19  off the piece that says that you may be a trial witness.

20       MR. SILVERMAN:  I understand, your Honor.

21       THE COURT:  May I ask you if you have an understanding

22  as to what subject you are competent to testify about that

23  could be litigated at this trial?

24       MR. SILVERMAN:  In my view, there is no subject that I

25  have relevant testimony to provide.  This is getting to one of

L46KCELC

1    the issues as to why Mr. Celli would like new counsel.  We have

2    different views, or Mr. Celli has had different views, with his

3    various counsel about what's relevant and should be offered at

4    trial.

5            As a pure legal matter, I don't think I have relevant

6    trial evidence to offer.

7            THE COURT:  I mean, I take it you did not meet

8    Mr. Celli until more than a year -- much more than a year after

9    the events at issue?

10           MR. SILVERMAN:  I first met Mr. Celli in October of

11   last year.  I never had any contact with him before I was

12   appointed on October 16th, 2020.

13           THE COURT:  All right.  Look, the reason I'm asking is

14   that if, in fact, you were a bona fide fact witness, there

15   would be a whole other set of issues to deal with.  If there is

16   not a credible theory under which you would be eligible to be a

17   trial witness, I'd like to remove that as a portion of the

18   discussion.

19           Mr. Silverman, let me ask you, when I take up with

20   your client whether there's a concrete basis on which to

21   believe you're qualified to serve as a trial witness, it's just

22   to tie up that loose end?  Shall I take that up with your

23   client?

24           MR. SILVERMAN:  Your Honor, can I ask permission to

25   move over to Mr. Celli and to make it quicker than the phone?

L46KCELC

1          THE DEFENDANT:  Oh, whatever.

2          MR. SILVERMAN:  I can use the phone as well.

3          THE COURT:  It's a matter of your comfort together,

4   and I don't want to probe about vaccination, but if there's any

5   discomfort either of you have, you should be using those

6   phones.

7          MR. SILVERMAN:  I appreciate that.  I'm comfortable

8   moving to my client very quickly, if that's okay with the

9   Court.

10          THE COURT:  Mr. Celli, are you comfortable with that,

11   too?

12          Go ahead.  Okay.

13          (Pause)

14          MR. SILVERMAN:  Your Honor, Mr. Celli would like to

15   address the Court on this topic.

16          THE COURT:  Sure.

17          Mr. Celli, let me just explain to you why I'm raising

18   this question.  If Mr. Silverman were, in fact, qualified to be

19   a trial witness, if, for example, he was a fact witness who was

20   an eyewitness to some of the events that may be at issue or

21   something like that, that would present a whole different

22   challenge and a different issue with respect to his

23   representation.  I was unaware of any basis on which he could

24   so serve, and Mr. Silverman appears to be similarly unaware of

25   such a basis, but since that representation is ultimately or

L46KCELC

1    that interest is coming from you, I didn't want to skip that

2    subject without giving you a chance to speak.  I will ask you,

3    though, just to -- a couple of things.  Just keep your remarks

4    to just that subject — there's plenty of other ground to

5    cover — and particularly because of the masking, speak slowly

6    and distinctly, so the court reporter can take down --

7             THE DEFENDANT:  Sure.

8             THE COURT:  -- what you say.

9             THE DEFENDANT:  So the reason, and it's not only

10   Mr. Silverman, it's all the prior lawyers as well, there is

11   evidence that was not presented at bail.  So I have asked other

12   people in the DOJ outside the Second Circuit.  They even see

13   it, what was done to me, as wrong.  I was deprived of all

14   procedural due process.  Everybody except Mr. Silverman told me

15   about -- the U.S. Marshals told me I wasn't in danger, and

16   there's a report, supposedly — I never seen it yet — but,

17   according to Mr. Silverman, there is a report.  So that should

18   have been presented at bail, and because of what happened at

19   bail, I'm being denied retro money, which is also a term of

20   retaliation for my exposure of Judge Cogan, who worked for the

21   UFT for over 20 years.

22            THE COURT:  Okay.

23            THE DEFENDANT:  So that's the issue.

24            THE COURT:  Thank you.  Look, I appreciate you

25   clarifying your thinking.

L46KCELC

1          I do have to say, though, that the issue at trial will

2     not be about what happened at bail or anything like that.  The

3     issue at trial is simply going to be framed by the charge

4     brought against you, whether you did or didn't, within the

5     elements of Section 875(c) of Title 18, commit that offense.

6     And so, whatever else happened in the history of the case after

7     you were charged, none of that speaks to whether or not you're

8     guilty or not guilty of that offense.  So, whatever issues you

9     have with respect to any of the lawyers who've represented you,

10    none of them is what we call a fact witness, none of them is

11    qualified to speak to the ultimate issues — you know, was there

12    a threat, was it in interstate commerce, was it to injure the

13    person of another -- that sort of thing, what was your intent

14    at the time.  Those are the issues on which --

15              THE DEFENDANT:  That's the other --

16              THE COURT:  Sorry, Mr. Celli.

17              THE DEFENDANT:  Sorry.

18              THE COURT:  It's very important, particularly because

19    we have a court reporter, always let me finish, as I will let

20    you finish.

21              THE DEFENDANT:  I apologize.

22              THE COURT:  No worries.

23          So, with respect, I appreciate that you may have

24    misgivings about some of the people who have represented you.

25    I'm not in any way crediting that as a valid misgiving, but you

L46KCELC

1    may have those, but that's a separate issue from whether

2    Mr. Silverman or any of those people, if they were still by

3    your side, would be a trial witness at trial.  There's really

4    no basis that I've heard under which Mr. Silverman could be

5    sitting here or its equivalent in the Eastern District during

6    your trial.

7            THE DEFENDANT:  They saw that Judge Cogan fixed my --

8    not only did he fix my state case, he fixed my bail hearing.

9            THE COURT:  Let me ask you, Mr. Celli --

10           THE DEFENDANT:  Yes.

11           THE COURT:  -- are you saying Mr. Silverman saw Judge

12   Cogan fix the hearing?

13           THE DEFENDANT:  No, but I have U.S. Marshals said that

14   they would fix my state case, and you know that under Federal

15   Rules of discovery -- Federal Rules of Evidence, opposing

16   statements are admissible, and those were the statements said

17   by the U.S. Marshals.

18           THE COURT:  All right.  Mr. Celli, putting aside what

19   the rules might be as to statements by the marshal — I'm trying

20   to keep focused here — the only reason I've raised this subject

21   is because there was a suggestion that Mr. Silverman might be

22   legally unqualified to represent you at trial because he would

23   be wearing a separate hat as a fact witness.

24           THE DEFENDANT:  Okay.

25           THE COURT:  Putting aside what evidence may be

L46KCELC

1   received, Mr. Silverman had nothing to do with any of those

2   events.  He entered this case at my appointment less than a

3   year ago, or about a year ago -- or less than a year ago, so he

4   is -- well less than a year ago.  So, with respect, I want to

5   move on to other business, but the only issue here is, is there

6   some proposition at trial that Mr. Silverman is a firsthand

7   witness to that he can testify?

8               THE DEFENDANT:  Yeah, because they're telling me what

9   my intent was.  Only I can say what my intent was.

10              THE COURT:  Well, the point is --

11              THE DEFENDANT:  And that's missing from the briefs.

12  So I don't know how you're going to render a decision today

13  when there are issues that I need to fix.

14              THE COURT:  Okay.  As I said, the only issue that I've

15  raised with you right now involves Mr. Silverman.  And from the

16  discussion I've had, my instinct is, I think, confirmed that

17  Mr. Silverman is not a fact witness; he had nothing to do with,

18  and was not present on the scene of, any of the events at

19  issue.

20              The next issue I want to take up involves the motions

21  in limine.  And I have several just discrete questions, and I'm

22  going to begin by putting a couple to the government.

23              With respect to the postarrest statement that

24  Mr. Celli gave on November 14th, you have identified subsets of

25  that statement, the yellow highlights, that you intend to

L46KCELC

1   admit.  I noted at the beginning that you do not intend to

2   elicit the Miranda warnings.  Would it be your intention,

3   during the examination of the witness, to bring out the fact

4   that there had been a Miranda warning?

5          MS. KARMIGIOS:  Yes, your Honor, we would elicit that

6   there had been a Miranda warning.

7          Yes, your Honor, we do intend to elicit that there had

8   been a Miranda warning and a waiver of his Miranda rights.

9          THE COURT:  The next question is:  An issue has arisen

10  about whether to play the audio alone or the video, and the

11  concern that was raised by the defense, in part, was that

12  Mr. Celli is handcuffed.  One of the issues is what a jury

13  might or might not infer from seeing the handcuffing.

14         Is it your intention, in order to minimize any

15  potential prejudice that could flow from the video showing the

16  handcuffing, to contextualize that briefly for the jury?  For

17  example, I am aware, in other settings, that in certain

18  situations, handcuffing somebody in a cellblock is literally a

19  matter of ordinary procedure, it doesn't reflect an

20  individualized judgment about them; it's if you're in the

21  cellblock, you're handcuffed.  And the question is:  Is there

22  evidence of that nature that can and would be elicited here to

23  give the jury a neutral explanation that does not focus on

24  anything specific to Mr. Celli for why the handcuffing is

25  occurring?

L46KCELC

1          MS. KARMIGIOS:  Your Honor, I do believe that the

2     witness will testify about the postarrest statement, would

3     testify to the fact that the handcuffs were part of a routine

4     procedure.  That's my current understanding.  I'd also add that

5     the government does intend to play the video.  We think it's

6     probative of Mr. Celli's demeanor, and we also think based --

7          THE COURT:  Sorry, sorry, I'm not asking for legal

8     argument, because I read the briefs, I'm prepared to rule, but

9     the missing ingredient for me was whether there would be any

10    evidence that explains to the jury what the handcuffing does.

11    I understand your reasons for believing the video is more

12    probative, and more useful, and clearer than the audio — I

13    fully get that — but on the other side of the equation, I have

14    to consider how the jury would react to seeing the handcuffs.

15    And one question is:  Are they going to be given some context,

16    so that the jury understands that the handcuffing is a matter

17    of routine in that space and not some judgment about Mr. Celli?

18         MS. KARMIGIOS:  Yes, your Honor.  With the caveat that

19    witness prep is ongoing, and it's still in its early stages, it

20    is my current understanding that the witness would testify that

21    this was a routine procedure.

22         THE COURT:  All right.  Okay.

23         The next question is for you, Mr. Silverman.  On

24    page 8 of the transcript of the prison calls, there is a

25    disputed section, which the defense would like added.  It falls

L46KCELC

1    between two of the highlighted sections that the government is

2    offering.  Tell me when you're there.

3           MR. SILVERMAN:  Yes, your Honor.  Does your Honor mean

4    the postarrest statement?

5           THE COURT:  I'm sorry if I was not clear.  Yes, the

6    postarrest statement.  Sorry, I think I may have said prison

7    call.  The postarrest statement.  On page 8, from lines 13

8    through 28, is a nonhighlighted portion which you would like

9    put in.

10          MR. SILVERMAN:  Yes, your Honor.

11          THE COURT:  I fully understand the arguments you've

12   made, and I'm respectful of them.  It looked to me as if what

13   you were trying to put in stops after the word "me" on line

14   either 24 or 25, that you were not seeking to add the next

15   sentence or two, which appears to be a bit of a brief switch of

16   thought.  I want to make sure I understand what you are asking

17   to be put in.  I understand you want to put in the marshal's

18   question and your client's response up to the word "me" on

19   line 24 or 25 and that you weren't pursuing the last two lines.

20          MR. SILVERMAN:  Yes, your Honor, that's correct.

21          THE COURT:  Okay.  It wasn't quite clear, and I wanted

22   to make sure that was the nature of the offer.

23          The next question I have involves the prison calls,

24   and this goes to the government.  The government proposes to

25   offer excerpts of two, quote-unquote, prison calls, meaning

L46KCELC

1    calls that were tape-recorded of Mr. Celli during his

2    postarrest incarceration before his release.  By the way, could

3    you remind me, just because I'm a successor judge in the case,

4    what were the circumstances under which Mr. Celli was held and

5    under which he came to be released?

6         MS. KARMIGIOS:  Your Honor, I'm also new to this case,

7    and I didn't -- I wasn't on this case at that time, so I don't

8    want to misspeak, but I'm happy to submit a letter if the Court

9    would like further information about that.

10        THE COURT:  Okay.  Well, that was background.  The

11   important question is as follows:  The parties are in agreement

12   about that the excerpts are properly offered, and, unlike the

13   postarrest statement, there is not a request that additional

14   material from the same calls be added as context.  Absent from

15   the government's brief, though, is any acknowledgment that

16   Mr. Celli is in prison during these calls, and that the fact

17   that he is in prison, which is what permits him to be

18   tape-recorded, might itself have an adverse -- be adverse to

19   Mr. Celli.  In other words, from a Rule 403 perspective, sure,

20   there's the probative value, such as it is of the excerpts you

21   want to offer, but some attention needs to be given to the fact

22   that he is in prison at the time.  Unless you see it otherwise,

23   I don't see a way in which those calls can be admitted without

24   the jury being alerted to the fact that he was in custody at

25   the time; otherwise, it's just unexplained what was happening

1   that led to a phone call of his to be taped, and I believe even

2   some of the excerpts of the calls themselves imply, at least,

3   that he is in custody.

4        Have you given thought to a way of mitigating whatever

5   prejudice there might be presented by the fact that the jury

6   would learn that Mr. Celli was in custody at the time of those

7   two calls?

8        MS. KARMIGIOS:  Your Honor, we would request

9   potentially a limiting instruction to the jury about that.

10        THE COURT:  What would it say?

11        MS. KARMIGIOS:  That the -- well, my instinct would be

12   that the jury shouldn't consider or put too much weight on the

13   fact that Mr. Celli was incarcerated during the calls, but I'm

14   happy, again, to submit further briefing on that point.

15        THE COURT:  Well, as I understand it, he's arrested on

16   November 14th.  One of the calls is as late as December; I

17   think the other one is later in November.  So, the one in

18   December inferentially would, presumably, suggest to a jury

19   that Mr. Celli had been in custody for perhaps from

20   November 14th through the date of that call in December.  The

21   concern is that some juror might conclude that the fact that

22   Mr. Celli had been in custody for that period must bespeak

23   something concerning about him.  And I'm trying to -- yes, of

24   course, a limiting instruction could tell the jury not to think

25   that or not to focus on that, and limiting instructions have

L46KCELC

1    their value.  Is this something the government had given

2    thought to before it was raised by the Court today?

3         MS. KARMIGIOS:  Honestly, your Honor, no, I had not

4    thought about this particular issue and what the limiting

5    instruction should look like, but I'm happy to do so and submit

6    further briefing to the Court.

7         THE COURT:  Mr. Silverman, have you any additional

8    views on the matter?

9         MR. SILVERMAN:  I appreciate your Honor's raising

10   this.  You're correct, I didn't respond to it because I didn't

11   recognize anything that the government was putting in that

12   would explicitly make clear that these were prison calls, and,

13   certainly, there are jury instructions that are given about

14   means and methods of government surveillance that are routine

15   that the jury could not infer why or how what was being done.

16   I've seen cases where the government seeks to offer as an

17   exhibit the poster next to the phones on Rikers Island that

18   gives you the warnings that the calls are recorded, and,

19   obviously, nothing like that's being offered here.  If that

20   were to be added to the government's motion, I would

21   respectfully request leave to put in a very short one-page

22   supplemental letter.

23        THE COURT:  No, of course.  Look, I appreciate your

24   thoughtful perspective on it.  The question is:  Right now, if

25   the tapes were to be played, would the jury be told anything

L46KCELC

1    about where Mr. Celli had been at the time the calls were

2    tape-recorded or how they came to be tape-recorded?

3         MR. SILVERMAN:  I would object to that on Rule 403

4    grounds.  I don't think that's relevant information.  I don't

5    think it's important for the jury to know how or why the calls

6    were recorded.  Juries regularly receive evidence, including

7    recordings, without knowing exactly how the recordings came to

8    be.  Frequently they do, but not always.

9         THE COURT:  So your proposition would be, in effect,

10   the less said, the better.  Whether authenticated by a witness

11   or by stipulation, the fact that these were excerpts of phone

12   calls that Mr. Celli had on the dates indicated, assuming that

13   there's a competent witness to authenticate the tapes, the

14   tapes would come in, but nothing would be said about where

15   Mr. Celli was, and the hope would then be -- and there would be

16   an instruction that -- Mr. Celli, I need to finish speaking.

17   You're waving your hand.

18        THE DEFENDANT:  Okay.

19        THE COURT:  I've got you.  Let me finish with

20   Mr. Silverman, and then you can confer with him.

21        Your proposition, Mr. Silverman, is the less said, the

22   better; essentially, authenticate them as tapes, do not situate

23   them in space, in venue, and give a limiting instruction that

24   instructs the jury not to speculate?

25        MR. SILVERMAN:  Exactly, your Honor.  And insofar as

L46KCELC

1    your Honor is correct that one of the statements he made refers

2    to why I'm here, I think that that doesn't necessarily -- and

3    the context is clear what he's saying.  We understand what he's

4    saying, but I don't think that it's necessarily clear where

5    "here" is without the context, and I don't think that the

6    contents of the statements make clear that he is incarcerated

7    at the time.

8             THE COURT:  All right.

9             It may be that Mr. Celli wanted you to communicate

10   something to me.  Why don't you speak.

11            (Pause)

12            MR. SILVERMAN:  Your Honor, respectfully, as a

13   proposal, Mr. Celli wishes to address this.  This has prompted

14   him to remember the bail motion, which I filed on his behalf on

15   January 4th, which he alluded to earlier, and which perhaps

16   would best be left until possibly after a *Faretta* hearing.

17            THE COURT:  We'll leave that for later.

18            Here's my thought for the government:  Mr. Silverman

19   may well have the right answer here, that may be the one that's

20   most respectful of his client's interests.  I would like the

21   government to give thought to the means and methods by which

22   the prison tapes would be received, i.e., assuming there's no

23   stipulation, who the witness is and what would be said, and

24   what, if any, instruction should go with those.

25            I'll give you a date to respond, and then,

L46KCELC

1    Mr. Silverman, I'd like you to have a follow-on letter

2    responding to that, so that I have the benefit of the defense's

3    view.

4            The government has told me about a straightforward

5    problem.  How long until you can get me a letter?

6            MS. KARMIGIOS:  Your Honor, I think I can have it done

7    by Friday.

8            THE COURT:  Very good.

9            So Friday, April 9th, for a letter just limited to

10   that issue about prison calls.  I'm not reopening the content

11   of the calls — I'll rule on that in a moment — but the issue

12   here just involves the means by which to mitigate any prejudice

13   to Mr. Celli.  Mr. Silverman may have the right answer, but I'm

14   eager to get everyone to think about it.

15           Mr. Silverman, can I have a letter from you three days

16   thereafter, three business days, maybe April 14th?

17           MR. SILVERMAN:  Yes, your Honor.

18           THE COURT:  Very good.

19           Mr. Silverman, I can't tell -- excuse me.  Mr. Celli,

20   your hand is up when your elbow is resting on the table.  I

21   can't tell whether you want to speak, but, as a general matter,

22   it is better to go through your attorney, lest you say

23   something that harms your interests.

24           MR. SILVERMAN:  Your Honor, may I have a minute --

25           THE COURT:  Yes.

L46KCELC

 1                (Defendant and counsel conferred)

 2                MR. SILVERMAN:  Your Honor, Mr. Celli wishes to

 3     address the Court.

 4                THE COURT:  All right.  Mr. Celli, I'm focusing right

 5     now solely on the issue of the prison tapes, but if it's

 6     important to you to speak, I will permit you to do so, but I

 7     want to admonish you that there is a reason why defendants

 8     speak through their counsel and are advised to do so, and it's

 9     that each time you put something out there, you're creating a

10     potential harm to yourself that something regrettable or

11     untoward is said, maybe it becomes a building block, or an

12     admission, or something unhelpful to your case.  One of the

13     reasons why it's best to have a spokesperson in court is

14     precisely to avoid your accidentally stepping on a landmine.

15                THE DEFENDANT:  So --

16                THE COURT:  If you must, I'll let you speak briefly,

17     but I'm advising you I'm trying to caution you not to do this.

18                THE DEFENDANT:  Well, I feel that I'm being deprived

19     of a fair trial, number one.  So that -- and I wrote that to

20     the senators as well.

21                The issue is, I was deprived of all due -- procedural

22     due process that is guaranteed by U.S.-Salerno and the Bail

23     Reform Act, and I keep on saying the last line of the bail act,

24     and even in the decision of the Supreme Court in U.S. Salerno —

25     I don't know the numbers off the top of my head, it's in my

L46KCELC

1    briefs — that up until trial, there could be evidence

2    resubmitted.  So I was deprived five months of liberty, which

3    is a crime.  The three people that were there was

4    Ms. Bensing -- sorry, not Ms. Bensing -- Ms. Brady, Judge

5    Scanlon, if I'm saying it right, and Ms. Olivera.  They

6    deprived me of testifying.  That is a crime, and you were the

7    head of the Southern District DOJ Criminal Division.

8               THE COURT:  No, first of all -- Mr. Celli, first of

9    all, no, I was not -- that was not a job I ever held, but, more

10   to the point, I'm really trying to keep us focused.  There are

11   a number of discrete issues here.

12              THE DEFENDANT:  Well, the recordings have occurred.  I

13   was deprived of liberty.  So there's the issue.

14              THE COURT:  Mr. Celli, I need to instruct you not to

15   interrupt.

16              THE DEFENDANT:  I apologize.

17              THE COURT:  I appreciate your views about the

18   deprivation of your liberty during your pretrial custody, but

19   the trial is not about that.  It simply is not.  That's not an

20   issue at trial.  Whether the decision to deny you release on

21   conditions of bail was right or wrong, procedurally proper or

22   not, is simply not the issue at trial.  The issue at trial --

23   and the jury will not be hearing about any of that because it

24   has nothing to do with whether or not you are guilty or not

25   guilty beyond a reasonable doubt.  And right now, I'm trying to

L46KCELC

1    raise a series of discrete issues to make sure that I'm

2    resolving them properly, in order to assure you a fair trial.

3    That's the whole point.  The reason why a judge zeros in on

4    discrete issues, like I'm trying to do, is to make sure that

5    both sides get a fair trial.  So where you could be most

6    helpful to yourself is by being responsive to me when I raise

7    specific issues, and the specific issue that I'm trying to put

8    on the table is this:  There are a couple of excerpts of phone

9    calls of yours that the government will be offering into

10   evidence, and I raised the issue of is there a concern that the

11   jury will draw a negative conclusion about you from the fact

12   that you were --

13              THE DEFENDANT:  And --

14              THE COURT:  -- in custody.  Mr. Silverman, I think,

15   has the most subtle analysis of how to deal with the problem,

16   and probably the right answer.  I wanted to give each side an

17   opportunity to comment.  If there's something that -- when I

18   saw your hand going up, I assumed you wanted to contribute to

19   that issue.  If you're going to be weighing in on some other

20   issue, like the justness of the denial of bail, I have to tell

21   you, this is not the forum for that.  We are now preparing for

22   trial, and I'm trying to identify issues that will affect the

23   conduct of the trial.

24              THE DEFENDANT:  But I've been trying to bring up

25   issues for two years now, and each -- and Judge Scanlon ignored

L46KCELC

1    it, and she threatened me, so now I have to put in a misconduct

2    because -- as for her, Ms. Scanlon, and Ms. Brady and

3    Ms. Bensing, I wrote to the senate judiciary because what

4    they've done to me is a crime, and they've been disciplined.

5    So, like, no one's hearing me.  Like I have been denied a fair

6    trial.

7              THE COURT:  All right.  Mr. Celli, Mr. Celli, you're

8    at liberty to write people about your grievances — it's a free

9    country — but in the context of this conference, I am here to

10   deal with discrete issues --

11             THE DEFENDANT:  And --

12             THE COURT:  One second.

13             -- of the trial that will occur, and I'm very

14   solicitous of everybody's opinion on the issues that I am

15   raising.  But grievances that you have about other people, and

16   including about your pretrial denial of bail, are not being

17   litigated.  The jury will not be deciding whether it was or it

18   wasn't right to deny you bail.  That's not what the case is

19   about.  The issue in the case will be whether or not the

20   government has proven the elements of the threat offense under

21   Section 875(c) beyond a reasonable doubt.  And in order to

22   assure you a fair trial, I need to make sure that my rulings as

23   to pieces of evidence are fair and consistent with the rulings

24   of evidence, and that's the spirit of the question I was

25   raising.

L46KCELC

1          THE DEFENDANT:  So my subjective intent is that Randi

2    Weingarten, through Senator Schumer -- wait, no, because this

3    is what you are withholding, because I emailed Senator Schumer

4    on 12/11/17, and I have many auto responses from him.  So this

5    is --

6          THE COURT:  Mr. Celli --

7          THE DEFENDANT:  Wait.  I emailed the ethics committee

8    on this.  I asked the senate judicial to send -- because you

9    told me I was stupid and crazy to suggest that Senator Schumer

10   had anything to do with your judgeship.  And I keep on telling

11   my attorney about Judge Porteous.  Judge Porteous was

12   convicted, and Senator Schumer is one of the 88 senators who

13   because -- sorry, Porteous lied about association.  You lied

14   about your association with Schumer.  On the record, it's

15   incumbent upon you, not me, to protect the integrity of your

16   office.

17         Now, there's a press release from Senator Schumer --

18         THE COURT:  Mr. Celli, I'm going to cut you off.  The

19   record of the conference at which you raised some question

20   about Senator Schumer speaks for itself.  I'm quite sure I did

21   not deny that Senator Schumer had recommended me for the job I

22   hold, I sit.  That's a matter of public record.  The broader

23   point, though, Mr. Celli, is we need to keep focused about

24   the --

25         THE DEFENDANT:  And I have been denied by Senator

L46KCELC

1   Schumer because of Randi Weingarten.

2            THE COURT:  Okay.

3            THE DEFENDANT:  And everything stems from there.

4            THE COURT:  Well, all right.  Maybe that's a good

5   prompt for me, then, to resolve the motions in limine, because

6   some of them will address the extent to which some of the

7   background that you're referring to has a proper place at this

8   trial.

9            Mr. Silverman, you looked as if you wanted to speak.

10           MR. SILVERMAN:  That's a great proposal.  Thank you,

11   your Honor.

12           THE COURT:  All right.

13           So what I'm going to do now is I'm going to turn to

14   the motions in limine that are pending.  For the record, I'm

15   handing a copy of the resolution that I would be reading aloud

16   to the court reporter.  By way of background, though, the Court

17   has received various motions in limine from the government and

18   from the defendant, Lucio Celli.  I'm going to resolve these

19   motions, to the extent I can, from the bench today.  I will not

20   be issuing a written decision.  Instead, I will simply issue an

21   order reflecting the fact that the motions were resolved, for

22   the reasons set forth on the record of today's conference.  So,

23   if the content of what I say is important to you, you will need

24   to order the transcript of this proceeding.

25           The first motion involves Celli's postarrest

L46KCELC

1    statements.  These were made in an interview conducted by two

2    marshals on November 14, 2018, that is recorded on video.  The

3    interview lasts about 20 minutes and takes place in what

4    appears to be a cellblock.  The motion here is by the

5    government.  The government states that it intends to offer

6    excerpts of Celli's postarrest statement, but that it does not

7    intend to offer these in their entirety.  And I'm citing here

8    Docket 100, the government's memorandum, at pages 4 to 5.  The

9    government moves to preclude as hearsay certain statements that

10   Celli made in the course of the interview.  Accordingly, the

11   government moves to preclude Celli from introducing any of his

12   own statements, such that the portion of the postarrest

13   statement that would be heard by the jury would be limited to

14   the excerpts highlighted in yellow in Exhibit A to the

15   government's letter.

16           Celli, for his part, does not object to the receipt of

17   the portions of the postarrest statements identified by the

18   government.  And for good reason.  The statements of Celli's to

19   the marshals that the government has designated are relevant

20   and probative to the issues at hand, and to the extent they

21   contain representations by Celli that the government wishes to

22   offer for the truth of the matters asserted, they are not

23   barred by Federal Rules regarding hearsay.  That is because

24   they are statements by a party opponent, and, as such, under

25   Rule 801(d)(2)(A), they fall outside the definition of hearsay,

1    if offered by the government.  In contrast, if offered by Celli

2    for the truth of the matter asserted, these statements by Celli

3    would be hearsay.  However, Celli argues that under Federal

4    Rule of Evidence 106, the rule of completeness, the entirety of

5    Celli's postarrest interview, or at least certain of his

6    statements that the government has not highlighted, should be

7    received.  These statements, Celli argues, are necessary

8    context for his exchanges with the marshals that the government

9    plans to offer.  I've cited here Docket 105, Mr. Celli's

10   opposition, at pages 2 through 4.

11         Rule 106 provides that where one party introduces a

12   portion of a document or recorded statement, "an adverse party

13   may require the introduction, at that time, of any other part —

14   or any other writing or recorded statement — that in fairness

15   ought to be considered at the same time."  As the Second

16   Circuit has explained, the omitted portions of the document or

17   statement "must be placed in evidence if necessary to explain

18   the admitted portion, to place the admitted portion in context,

19   to avoid misleading the jury, or to ensure fair and impartial

20   understanding of the admitted portion."  Citing *United States*

21   *v. Johnson*, 507 F.3d 793, 769 (2d Cir. 2007).

22         However, the circuit has stated:  "The completeness

23   doctrine does not, however, require the admission of portions

24   of a statement that are neither explanatory of, nor relevant

25   to, the admitted passages."

1    To the extent that Celli suggests in a sentence that

2    the entirety of his postarrest statement must be received as

3    context under Rule 106, that is not persuasive.  The interview

4    covers a variety of topics.  It has at various points a

5    rambling quality.  It covers topics including details of

6    Celli's civil lawsuits, and personal traumas that Celli has

7    experienced, and Celli's views on various persons and matters

8    that are irrelevant in this criminal case.  The vast majority

9    of the nonhighlighted portions would not shed any light or

10   provide any useful context for the discrete portions that the

11   government has highlighted.  The highlighted portions cover no

12   more than about 25 percent of the interview.  And, in general,

13   Celli's postarrest statements cannot be properly received for a

14   nonhearsay purpose, such as to illuminate Celli's state of

15   mind.  That is because his state of mind after his arrest,

16   which came after the communication of the alleged threatening

17   emails in this case, is not relevant to the charges at issue.

18   The Court therefore rejects Celli's broadly put argument that

19   all nonhighlighted portions of his postarrest statement are

20   admissible under Rule 106.  And I should add that many of those

21   portions would be prejudicial to Celli.  They include portions

22   in which he becomes excitable and in which he makes accusations

23   or statements that the jury may regard as unreliable,

24   unflattering to Celli, or worse.

25        Celli, however, makes a more substantial, and more

L46KCELC

1   targeted, argument under Rule 106 as to two specific excerpts

2   of his postarrest statement.  I'm citing now Celli's opposition

3   at 2 through 4.

4           The first excerpt appears on page 8 and covers

5   lines 13 through 24.  It comes immediately after Celli has been

6   asked about the emails, and what he wrote in them, and to whom

7   he wrote them.  Celli responds to those questions.  Those

8   exchanges, the government plans to offer, without objection.

9   But the government proposes not to offer the following

10  question, beginning on line 13, in which the marshal probes

11  Celli's state of mind in writing what he wrote, and to which

12  Celli responds, beginning on line 17.  And I am quoting now the

13  first disputed excerpt.

14          "Marshal:  So what do you, I understand you're upset

15  and, um, when you stated in your email about stabbing them?

16          "Celli:  I don't mean to actually do it because I'm

17  not a violent person.  I want justice.  Like, I don't think I

18  should have had to -- I've emailed many times without

19  threatening, and I think I submitted the right way the judicial

20  complaint, and then the New York City Mental Health came to

21  me..."

22          And I'm citing again the postarrest statement at

23  page 8.

24          The portion of Celli's response that I have quoted

25  ends on line 24.  I should add that Celli's response goes on to

L46KCELC

line 28 and covers another long sentence and a short one, in which Celli makes statements that appear to refer to an unrelated report he made to the New York City police regarding a white person and how the police responded by showing him, in some fashion, it appears, pictures of African Americans.  As to these lines, 24 through 28, Celli does not argue that these are necessary to receive in the interests of completeness.  I confirmed that with Mr. Silverman a few moments ago, and I agree with that.  That one- to two-sentence detour between lines 24 and 28 is extraneous and irrelevant.

Critically, immediately afterwards in the interview, beginning at line 30, comes another exchange that the government highlights for inclusion.  In it, the marshal, referencing what Celli had just said, asks the following leading question:

"So, you were aware that the emails you sent out were threatening?"

And Celli responds, beginning at line 33, "Cause I feel threatened as well because I don't know how to get justice anymore, because if it's okay to threaten me, it's okay to threaten back.  Because they're not above the law.  That's how I feel."

The marshal then responds with this query:  "And when you say them?"

Celli responds:  "The federal judges."

L46KCELC

1        That brief exchange is the last part of that section

2   that the government highlights.

3        Celli argues that the inclusion of this exchange is

4   necessary context for the exchange that follows, in which Celli

5   explains that he felt threatened.  The government argues that

6   it must be excluded as hearsay.

7        I am persuaded by Mr. Silverman's argument on this

8   point.  As he convincingly argues, the excerpt between lines 13

9   and 24 provides necessary context for the exchange that

10  follows, within the meaning of Rule 106.  Without it, the

11  marshals' question about whether Celli was aware that the

12  emails he sent were threatening provides an incomplete portrait

13  of Celli's state of mind at the time he sent the emails as

14  Celli was reporting it.  In effect, the marshals' question

15  zeroed in on one part of Celli's previous answer relating to

16  his awareness of the threatening quality of the emails, and the

17  marshals' question prompted Celli to elaborate on that point.

18  But if the previous answer, between lines 13 and 24, is not

19  included, it risks the jury considering Celli's ensuing answers

20  in incomplete context.

21       And that risk is particularly acute because the

22  marshal begins his question, at line 29, with the word "so."

23  He states, "So, you were aware that the emails you sent out

24  were threatening?"  The word "so" is a cue.  It's a cue to the

25  listener that the marshal was picking up on something that

1    Celli had just said.  If the jury does not hear the previous

2    exchange, however, there is considerable risk that they will

3    speculate about what it was that Celli had said that led to the

4    marshal, in harkening back to Celli's immediately prior

5    statement, to attribute to Celli an awareness that his emails

6    had been threatening.  Fairness to Celli requires that the jury

7    know what the marshal was referring to when he concluded, and

8    asked Celli to confirm, that Celli had been aware that the

9    emails were threatening.  So, I will admit lines 13 to 24 under

10   Rule 106, in fairness to Celli.

11           I do this to assure that the jury can understand the

12   ensuing exchange in the proper context, and so, government,

13   when you offer the interview excerpts, you must include the

14   lines 13 through 24 if you intend to offer the lines that

15   immediately follow, as I expect you will continue to plan to

16   do.

17           Now, Celli separately argues that an excerpt at

18   page 10, lines 22 to 32, also be received.  This exchange

19   occurs a little later in the interview.  At this point in the

20   interview, the marshals have asked Celli about various emails

21   he sent.  Celli reads aloud from one.  He then stops reading.

22   That is where the government's highlighted excerpt ceases.

23   Celli then states that certain documents were missing from the

24   Court, apparently a reference to one of his civil cases, and

25   then comes the following exchange, which Celli asks be received

1     and put before the jury.  I'm quoting now again from lines 21

2     to 32:

3              "Celli:  I have the -- excuse me, I don't want to come

4     off as threatening.  I apologize.

5              "Marshal:  That's okay.

6              "Celli:  No, because I know, I -- I apologize.

7              "Marshal:  That's all right.  You're a person that

8     talks with his hands.  I know what you mean.  You're fine.

9     You're fine, you're fine."

10             Celli argues that this exchange is admissible for two

11    reasons under Rule 106 and as evidence of his state of mind.

12             The Court is unpersuaded.  Viewing the exchange

13    alongside the video, it is clear that this exchange was

14    prompted by Celli's having suddenly become very animated.  He

15    waves his arms around while holding papers, apparently the

16    emails the marshals had been asking him about.  And he either

17    brushes or comes close to brushing against the marshal's leg in

18    the confined space of the cellblock.  That is the clear context

19    of these remarks.  Celli is essentially apologizing for either

20    coming close to or invading the marshal's space, and/or for the

21    volume of his remarks.  But this excerpt, unlike the earlier

22    one on page 8, does not shed any light on any succeeding or

23    preceding remarks.  Rule 106 does not require the admission of

24    this excerpt.  It is an apology for a brief event, the brush of

25    the papers and/or the raising of the voice, that began after

1    the excerpt that the government intends to offer ended.

2           To the extent that Celli separately argues that the

3    exchange is probative of how the marshals interact with and

4    perceive Celli's behavior, that is not a proper basis for

5    admission either.  Celli at this moment was gracious in

6    apologizing for his gesticulations and outburst.  And the

7    marshals graciously acknowledged that Celli, in speaking with

8    his hands, did not mean to be threatening.  But the marshals'

9    perceptions of his postarrest behavior are irrelevant to any

10   issue to be tried.  Their assessments, which the transcript and

11   video suggests were to the effect that Celli had not meant

12   anything threatening by his immediately preceding gestures and

13   loud words, do not speak to Celli's mens rea or state of mind

14   at the time he took the actions at issue in this case — the

15   preparation and sending of the emails to judges that the

16   government alleges were actual threats.  In any event, even if

17   Celli's civil behavior at this brief moment with the marshals

18   is some way regarded as probative of his broader capacity to be

19   civil, it would be significantly outweighed by the capacity of

20   this episode to confuse.  That is because Celli's interest in

21   offering this is precisely to achieve a forbidden inference,

22   to wit, that the marshals had concluded that Celli more

23   generally was not a person capable of making actual threats or

24   inclined to make actual threats.  That inference does not

25   follow from this excerpt.  And even if it did, the marshals are

L46KCELC

1   not expert witnesses on human psychology and character.  I

2   would thus exclude this excerpt under Rule 403, if it were not

3   independently inadmissible under Rule 401 and 402 as

4   irrelevant.  It is confusing and potentially prejudicial.

5        Now, there is a final separate issue as to the

6   postarrest statement.  Celli argues that with respect to his

7   interview by the marshals, the Court should permit the jury to

8   hear the audio, but not see the video.  Citing here Celli's

9   opposition at 4 to 5.  That is because Celli is handcuffed in

10  the video.  Celli expresses concern that the presence of the

11  handcuffs and Celli's presence in a cellblock may be taken to

12  suggest that the marshals were too afraid to interview him

13  unrestrained.

14       Separately, Celli notes that insofar as the parties

15  and counsel will wear masks during the trial, these images of

16  him may be the only ones of him without a mask on that jurors

17  are able to see.  This, too, Celli argues, favors exclusion of

18  the video.

19       The Court has carefully reviewed the postarrest

20  interview.  The Court has listened to it accompanied and not

21  accompanied by the video footage.  The Court's inquiry as to

22  whether to permit the video to play is under Rule 403, which,

23  again, permits the Court to exclude "relevant evidence if its

24  probative value is substantially outweighed by a danger of,"

25  among other factors, "unfair prejudice."

```
 1              Here, as to the handcuffs, Celli relies on United
 2     States v. Hurtado, 47 F.3d 577 (2d Cir. 1995).  There, the
 3     Second Circuit held that a defendant should not be compelled to
 4     attend trial in prison or jail clothing due to the possible
 5     impact on the defendant's presumption of innocence and due
 6     process right to a fair trial.  Id. at 581.  The Supreme Court
 7     has similarly recognized that a defendant's wearing of prison
 8     clothes or use of physical restraints in the courtroom can
 9     adversely affect how jurors feel about him.  See Estelle v.
10     Williams, 425 U.S. 501, 505 (1976).  For this reason, of
11     course, as counsel are familiar, efforts are made as to
12     defendants who are in custody to assure that they are in street
13     or civilian clothing during trial and that they are not visibly
14     restrained in the presence of the jury.
15              Celli is not in that situation.  He is not
16     incarcerated, and so at trial, he will be in civilian clothing
17     and not restrained.  Under these circumstances, the negative
18     inference that may arise from a defendant's being shackled in
19     court will not arise.  The handcuffing of a defendant in a
20     cellblock immediately following an arrest, by its nature, is
21     not likely to give rise among jurors to any fear of the
22     defendant, where the defendant is visibly unrestrained and at
23     liberty in court.  And the body language of the marshals during
24     the interview, as reflected on the video, does not bespeak any
25     physical concern about Celli.  Moreover, counsel are at liberty
```

L46KCELC

1    to establish, as I expect from my colloquy with government

2    counsel is correct, through questioning of the marshals or

3    perhaps through a stipulation, that the interview occurred

4    shortly after Celli's arrest and that it is normal procedure to

5    handcuff a person interviewed in the cellblock following his

6    arrest.

7        Under Rule 403, I therefore find a very limited

8    prejudice, if any, to the defendant from showing the video.

9        I also do not find meaningful prejudice from the fact

10   that Celli's full face appears in the video.  It is, of course,

11   unfortunate that as a result of public health precautions,

12   Celli and the other personnel at trial will generally be

13   masked.  That said, the jury will get a view of Celli's full

14   face at some points, including during jury selection, but that

15   does not mean there is anything prejudicial about the jury's

16   viewing Celli's face during the interview.  There is nothing

17   inherently prejudicial about his face or the expressions he

18   makes during the interview.

19       On the flip side, having listened to the audio with

20   and without the video, it is palpably easier to follow by

21   video.  It is clear who is speaking and what is being said, and

22   it is clear when the defendant is reading from a document as

23   opposed to responding to a question.  The video promotes

24   clarity and eliminates confusion.  I therefore find that the

25   probative value of the video, far from being substantially

L46KCELC

1    outweighed by countervailing factors such as unfair prejudice

2    or confusion, significantly outweighs those factors.  So I will

3    permit the government to play the video when it plays the

4    excerpts at trial.

5             Switching gears:

6             The government next moves in limine to offer excerpts

7    of two calls that the defendant had while in prison, a call on

8    November 22, 2018, and a call on December 3, 2018.  Celli does

9    not object to these excerpts being received, nor does he argue

10   that other excerpts must be received under Rule 106.  The Court

11   will therefore permit these excerpts to be received at trial.

12            Now, a few moments ago, I had a colloquy with counsel

13   about a collateral issue involving the fact that these

14   interviews took place in prison.  I am eager to, as best as

15   possible, minimize any possible prejudice to Mr. Celli from the

16   fact that these calls took place in prison, and I solicited

17   letters from counsel on that point.  Offhand, Mr. Silverman's

18   insight appears to be the most perceptive as to the best way to

19   minimize the prejudice, but I will be eager with everyone

20   having an opportunity to reflect on the right way to handle

21   this, to get your thought-out views.

22            Next, the government moves for permission to offer

23   certain of Celli's email communications before the date of the

24   threats at issue, and his interactions with the marshals prior

25   to the date of the alleged threats, as either direct evidence

1    or under Rule of Evidence 404(b).  Celli moves to the same

2    effect.  He would like his prior communications with the

3    marshals to be received as circumstantial evidence of his state

4    of mind in connection with the later threats.  He would also

5    like these communications received as evidence of whether an

6    objective person would consider the November 12, 2018 emails

7    threatening.  Celli does not oppose the government's motion to

8    introduce either the emails or interactions with the marshals.

9    However, the government opposes Celli's introduction of

10   evidence regarding his prior interactions with the marshals

11   insofar as Celli seeks to offer various unspecified statements,

12   which the government calls false exculpatory statements and

13   self-serving, for the truth of the matter asserted.

14          The government has filed under seal a number of

15   documents reflecting Celli's prearrest interactions with the

16   marshals and a sample of his prearrest emails.  Based on the

17   documents before the Court at this point, the Court is

18   constrained to agree with Mr. Silverman's apt observation that

19   there is, as yet, no live dispute here.  Both parties agree

20   that at least some of Celli's Pre-November 12th emails are

21   admissible, and that the course of dealing between Celli and

22   the marshals who confronted him about these emails is, in

23   general, properly admitted.  And that is clearly correct.  The

24   government is correct, in general, that Celli's emails and

25   confrontations with the marshals preceding his alleged threats

L46KCELC

1    to the judges in November are admissible as background to the

2    events at issue, both under Rule 402 and Rule 404(b).  The

3    government's narrative appears to be that Celli became

4    progressively more enraged and retributive over time.  The

5    government's narrative is further that the marshals' visits to

6    him, for which he blamed the judges in the civil cases for

7    bringing these about, are among the reasons that Celli's emails

8    escalated in tone to the point that in November, they became

9    actual threats.  These dealings are clearly probative for that

10   purpose.  And no party has identified, as yet, any

11   countervailing aspect of these emails or communications that

12   require their exclusion, although it may be that discrete lines

13   or words require redaction in the interest of avoiding unfair

14   prejudice, particularly to Celli.

15          From Celli's perspective, he is entitled, too, to

16   develop this course of dealing, and that is so for two reasons:

17   First, Celli may try to draw on these to rebut the government's

18   theory that his earlier dealing with the marshals provoked him

19   to greater outrage and more serious threats; and, second, Celli

20   may draw on these to argue that his subjective state of mind

21   and intent was influenced by these dealings.

22          There does not appear to be a dispute as to these

23   points.  The government's opposition, such as it is, rests on

24   an apparent misconception of Celli's argument.  The Court does

25   not understand either Celli or the government to be offering

L46KCELC

1    statements made during Celli's prior interactions with the

2    marshals for the truth of the matters asserted therein.  The

3    government purports to offer these statements to "provide

4    necessary background and context to the charged offense."

5    Citing the government's memo at 6.  And Celli explains that he

6    intends to offer these statements as evidence of his state of

7    mind and Federal Rule of Evidence 803(3) provides a hearsay

8    exception for just this purpose.  It permits a party to

9    introduce out-of-court statements reflecting "the declarant's

10   then existing state of mind (such as motive, intent, or plan)

11   or emotional, sensory, or physical condition (such as mental

12   feeling, pain, or bodily health...)."  Celli's statements made

13   during his Pre-November 14 interactions with the marshals are

14   probative of his state of mind at the time he sent the earlier

15   emails, for which he was not indicted.  To be sure, as the

16   government notes, Celli has not been charged in the indictment

17   in connection with these emails, but, as the government argues,

18   in the point that favors the inclusion of this evidence for

19   both parties' use, the earlier emails and interactions with the

20   marshals are "inextricably intertwined with the evidence

21   regarding the charged offense."  Citing the government's memo

22   at 6.  Celli may therefore offer, in general, his statements in

23   his pre-November 14 dealings with the marshals as evidence not

24   for the truth of the matter asserted, but of his state of mind.

25              To the extent that there are statements by Celli

L46KCELC

1    during the pre-November 14 period that the government is

2    concerned would be improperly considered for the truth of the

3    matters asserted, the government has yet to specifically

4    identify any of these to the Court.  The Court therefore has no

5    occasion to rule at this point whether discrete such statements

6    could be admitted only subject to a limiting instruction or

7    perhaps could not be admitted at all.

8            Importantly, in holding that Celli's Pre-November 14

9    interactions with the marshals are generally admissible as to

10   Celli's state of mind, the Court is not authorizing Celli to

11   rely on evidence of these interactions as evidence as to

12   whether an objective observer would consider Celli's earlier

13   emails to be threatening.  The marshals cannot stand in for an

14   objective person.  Their decisions how to respond in the moment

15   to Celli, or whether to arrest Celli based on those threats,

16   emails, or communications, may reflect a host of

17   considerations.  These include the marshals' decisions as to

18   how to allocate their times and resources and the direction, if

19   any, they had been given as to how to respond to Celli.  These

20   may also include the marshals' assessment of Celli's mental

21   state.  The Court will not permit argument that because the

22   marshals did not arrest Celli, or take other action prior to

23   November 12th, an objective observer would not regard Celli's

24   Pre-November 14 emails as being not threats.  These

25   communications, in other words, may be considered to the extent

L46KCELC

1    they bear on Celli's state of mind, but they may not be

2    considered as bearing on how an objective observer would view

3    Celli's statements.

4           Turning now to Celli's civil suit.  The parties have

5    also submitted motions in limine as to the extent to which

6    Celli and the government can offer evidence as to the prior

7    civil lawsuits in which Celli participated before Judge Brodie

8    and Judge Cogan during the years 2015 to 2018.  Celli has filed

9    a related pro se letter related to this point.  See Docket 123.

10   The fact and broad nature of these lawsuits, and Celli's

11   posture in them, and the status of the lawsuits at the time of

12   the alleged threats are all properly being put before the jury.

13   So, too, are the developments in the lawsuits that are alleged

14   to have provoked Celli to begin and continue his emails to the

15   judges and others.

16          However, the details of the two civil lawsuits, and

17   any other civil lawsuits to which Celli was a party or

18   participant, are largely irrelevant to the current case.  The

19   prosecution is not about those lawsuits.  It is not about who

20   was right or wrong in them.  That is because threats are not

21   defensible on the ground that they were made to avenge

22   erroneous rulings or unfortunate developments.  Evidence beyond

23   more than necessary to give brief background and context about

24   Celli's civil lawsuits would not add probative value.  On the

25   contrary, it would potentially distract the jury, misleading

L46KCELC

1    the jury to believe that the merit of those lawsuits were at

2    issue, and it is not.  And it would potentially waste time,

3    potentially a lot.  Such evidence is thus clearly properly

4    excluded under Rule 403.

5          To assure that there is clarity as to what is

6    permitted, the Court directs the parties to confer as to the

7    evidence to be offered about the civil lawsuits.  The Court

8    further directs the parties to present to the Court, by two

9    weeks before the start of trial — that is May 3rd — with

10   letters setting out their respective views as to the evidence

11   relating to the civil lawsuits that each would seek to offer at

12   trial.  While the Court's statements today should give counsel

13   ample guidance, these submissions will enable the Court to

14   resolve any concrete disputes that may linger as to the limited

15   information about the civil suits that may be properly elicited

16   at trial as context for the alleged threats that followed.

17         All right.  Switching gears:  The government next

18   moves "to preclude the defendant from presenting evidence or

19   making arguments referencing any First Amendment right to have

20   sent the November 12, 2018 emails because no such right

21   exists."  Quoting the government's memo at 9.  The defense

22   acknowledges that the First Amendment does not give citizens a

23   right to make threats such as to kill a federal judge.  Citing

24   Celli's opposition at 6, referring to the "nonexistent First

25   Amendment right to threaten."  And, thus, there does not appear

L46KCELC

1     to be a live dispute as to this issue.  It appears to be common

2     ground that the First Amendment is not a fit subject for

3     counsel to comment on before the jury.  Nevertheless, for the

4     sake of assuring that there is no confusion on this point, the

5     Court will address the issue.

6               The only role that the First Amendment plays in cases

7     under 18, U.S.C., Section 875(c) is insofar as it informs the

8     lawful reach of the statute.  The First Amendment allows

9     statements that are "true threats" to be prohibited and

10    criminally prosecuted, including under Section 875.  As the

11    Second Circuit has put the point, "Prohibitions on true threats

12    — even where the speaker has no intention of carrying them

13    out —...are fully consistent with the First Amendment."  I'm

14    citing *United States v. Turner*, 720 F.3d 411, 420 (2d Cir.

15    2013).  Whether the evidence permits a jury to find beyond a

16    reasonable doubt that a particular statement is a true threat

17    and therefore outside the protection of the First Amendment is

18    a legal determination for the Court.  The Court will make that

19    determination at the close of the evidence, assuming that a

20    motion to this effect is made by the defense under Federal Rule

21    of Criminal Procedure 29.  The application of the First

22    Amendment is not a subject for counsel to take up before the

23    jury.  The Second Circuit has squarely so held, and I quote:

24    "The question of the application of the First Amendment to the

25    statute here is properly for the Court rather than the jury."

L46KCELC

*United States v. Kelner*, 534 F.2d 1020, 1028 (2d Cir. 1976).

Counsel's roles are instead in guiding the Court as to the proper jury instruction and then in arguing before the jury whether the evidence establishes the elements of the offense of Section 875(c) as charged.  It's premature for the Court to anticipate the particular instruction it will give.  However, Judge Sand's treatise offers, as usual, a useful overview of the elements of this offense.  I'm citing Leonard Sand, et al., Modern Federal Jury Instructions (2016 ed.).  Instruction 31-7 in that venerable treatise lists the following as the three elements of Section 875(c) that the jury, to convict, must find beyond a reasonable doubt:  (1) that "the defendant threatened to kidnap or to injure [the victims]"; (2) that "the threat was transmitted in interstate or foreign commerce"; and (3) that "the defendant transmitted the threat knowingly and intentionally."

Celli argues that he (1) "should be permitted to argue to the jury that Mr. Celli cannot be convicted merely because his statements are crude and inflammatory"; (2) "that knowledge that statements are offensive or startling does not equal intent to threaten"; and (3) "that the jury can use its common sense and everyday experiences to infer that a citizen like Mr. Celli would believe that he has every right to say offensive things."  I'm citing Celli's opposition at 6.  As to the first two of these points, these concepts, to the extent

L46KCELC

1    they capture propositions of law, are in the proper province of

2    the Court's instructions to the jury.  These instructions,

3    however they are ultimately put, will make clear that the fact

4    that a statement is crude, or inflammatory, or offensive, or

5    startling alone does not make it a threat.  The model Sand

6    instruction, instruction 31-7, says essentially this, and I

7    quote:  "A threat is a serious statement as distinguished from

8    idle or careless talk, exaggeration, or something said in a

9    joking manner.  For a statement to be a threat, the statement

10   must have been made under such circumstances, that a reasonable

11   person who heard or read the statement would understand it as a

12   serious expression of an intent to inflict bodily injury (or

13   murder or kidnap)."  It will be for counsel to argue the point

14   of whether the facts satisfy that standard.

15           And as to the third point being made by Mr. Celli, as

16   the Court will instruct the jury, the jury may use its common

17   sense and everyday experience in finding the facts.  And

18   counsel on both sides will surely invoke common sense and

19   experience in arguing whether the elements have been

20   established.  But it's not for counsel to argue, whether based

21   on common sense or otherwise, what the law is.  That is the

22   province of the Court.  The Court expects to instruct the jury,

23   broadly consistent with the model instructions of the Sand

24   treatise, that the government must prove that the defendant

25   "made the statement intending it to be a threat or with the

L46KCELC

1    knowledge that the statement would be viewed as a threat."  The

2    Court expects to further instruct the jury, in substance — I'm

3    quoting Sand again — "The government must prove that the

4    defendant intended the communication be received by [the

5    victim] as a threat.  The government is not required to prove

6    that the defendant intended to carry out the threat."  These

7    instructions will fully safeguard the defendant's right not to

8    be convicted based on protected speech that falls short of

9    being a true threat.  Counsel may also argue, and the Court

10   expects that counsel on both sides will, that the jury can

11   consult its common sense in determining whether the evidence

12   has established these elements.  But to be clear, it's for the

13   Court, not counsel, to instruct the jury as to the law.  So, if

14   anything is to be said to the jury about the relationship

15   between the First Amendment and the statute, it is for the

16   Court to do so, not counsel.

17          One final point:  There is no constitutional right to

18   make threats that fall within the scope of the statute as

19   defined by its elements.  And it does not appear that the

20   defense is planning to argue otherwise or that Celli thought

21   that there was such a right.  The defense, it appears, will be,

22   in whole or in part, that the statements should not be found as

23   threats or that Celli did not have the requisite intent to

24   threat.  For avoidance of doubt, however, the defense will not

25   be permitted to make an argument sounding in nullification,

L46KCELC

1    to wit, that the statute should not be enforced, for example,

2    because it offends a juror's view of what the Constitution

3    should protect.  Counsel will be at liberty at the close of the

4    evidence to argue to the Court that the evidence, as a matter

5    of law, is insufficient, and if that argument fails, counsel

6    will be at liberty to argue to the jury that the evidence does

7    not establish the elements beyond a reasonable doubt.  Counsel

8    may not, however, argue that if the elements are established

9    beyond a reasonable doubt, the statute should not nevertheless

10   be enforced.

11        Final point:  Celli moves to redact any offensive or

12   sexist remarks in any emails of his that the government offers

13   at trial.  See Celli memo at 17.  Celli argues that certain

14   offensive remarks of his are likely to inflame the jury and

15   should be excluded under Rule 403.  However, the government has

16   indicated that it intends to confer with defense counsel

17   regarding exhibits, so as to moot the need for the Court's

18   intervention in this matter.  Accordingly, the Court declines

19   to rule on this motion at this time.  The Court is confident

20   that counsel, working together, can agree upon appropriate

21   redactions.

22        That ends the motions in limine.

23        Let me just check with our court reporter, before we

24   move to the next segment, whether you would like a comfort

25   break?

L46KCELC

1          (Discussion off the record)

2          THE COURT:  Why don't we do this:  It's 3:17.  I'll

3   see you at 3:25, and at that time, we'll pivot to the *Faretta*

4   portion of the conference.  Thank you.

5          (Recess)

6          THE COURT:  Welcome back, everyone.  Back on the

7   record.

8          I now want to pivot to the request that was made in

9   Mr. Silverman's letter of March 29th in which he states that

10  Mr. Celli informs him — informs Mr. Silverman — that he,

11  Mr. Celli, wishes to represent himself at the coming trial.

12         I have removed from the equation the concern that

13  Mr. Silverman might be a fact witness.  Even with that removed,

14  Mr. Silverman, I take it Mr. Celli is still interested in

15  exploring representing himself at trial?

16         MR. SILVERMAN:  Yes, your Honor.

17         THE COURT:  All right.  Then given that, Mr. Celli, as

18  I'm sure Mr. Silverman has explained, there is a process by

19  which a judge has to engage, in effect, have an extended

20  conversation with the defendant because that's an extremely

21  serious and fraught decision, and there is case law from the

22  Supreme Court that structures the conversation I am to have

23  with you, so that, at the end of the day, I can determine

24  whether to approve a request like that, and many of them are

25  not approved and some are, but it ultimately turns on the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L46KCELC

1    responses that I receive and my assessment after that.  So what

2    I'm going to have happen is Mr. Smallman is going to place you

3    under oath, and I will confirm that you understand what it

4    means to be under oath, and then I will put a series of

5    questions to you which you will be obliged to answer under

6    oath.

7                   THE DEFENDANT:  Sure.

8                   THE COURT:  Before we begin, Mr. Silverman, I take it,

9    you have reviewed with Mr. Celli the nature of the questions

10   that a court tends to put to a defendant who seeks to represent

11   himself?

12                  MR. SILVERMAN:  I have, your Honor.  And just to

13   preview two quick points:  One, Mr. Celli will explain this

14   during his allocution.  When asked if this is knowing and

15   voluntary, which is a critical part of the inquiry, his answer

16   will be:  It's not what he wants; he wishes he had a lawyer who

17   would defend him in a way that he thinks is appropriate, and

18   that that would be his preference.  He understands that your

19   Honor said that there would not be another substitution for the

20   reasons that have previously been stated, and he, therefore,

21   wishes to represent himself.  And so far as voluntariness means

22   coercion, threats, or that kind of duress, Mr. Celli will

23   allocute on his own, but I just want to preview that point.

24                  And your Honor has, no doubt, reviewed the

25   government's proposed *Faretta* questions, and your Honor has

1   your own questions, I'm sure, but I just want to note two quick

2   things on the government's questions, if it's okay with the

3   Court.

4           THE COURT:  Sure.  I have my own questions, but I'd be

5   happy to get your perspective on the government's.

6           MR. SILVERMAN:  I appreciate that.  Thank you.

7           On their question 16, I would respectfully --

8           THE COURT:  Read that one aloud.  I've got my own.

9           MR. SILVERMAN:  Question 16 is:  "Do you understand

10  that once you make this decision, it is not a situation where

11  you can change your mind, for example, after the trial begins,

12  and go back and forth, and say that you need a lawyer for this

13  or that, even if I appoint you standby counsel, that counsel

14  will serve only as your legal advisor and is unlikely to be in

15  a position to take over for you at trial?  Do you understand

16  that?"  That's the government's letter, Docket 130, at page 3,

17  question number 16.

18          And I would -- just with respect to that one question,

19  I would respectfully offer that that language is a bit strong.

20  *Faretta* itself came up with the term "standby counsel."  It

21  contemplates standby counsel.  I agree that it is something to

22  advise that going back and forth is not practical, like a

23  see-saw, but I believe Mr. Celli will tell the Court that there

24  may be things he's amenable to assistance from counsel for,

25  including the questioning of some witnesses and including

L46KCELC

1    ongoing negotiations with the government about a resolution.

2    If he's amenable to that kind of assistance, or if he decides

3    that he's amenable to that kind of assistance, I would

4    respectfully request that the Court exercise its discretion to

5    allow him to receive it.  I appreciate that that's within the

6    Court's discretion.

7          And as a final point, the government notes in its

8    point 9 that it calculates the guidelines after trial at 33 to

9    41 months, and I would only note that when reviewing this with

10   Mr. Celli, and as I say now, that's the government's

11   calculation of the guidelines, and I would just respectfully

12   request that the Court not adopt them formally, as it's clearly

13   not the right time.

14         THE COURT:  I did not have any intention of quoting

15   any guideline range.  May I ask you whether that calculation

16   would credit Mr. Celli for acceptance of responsibility if

17   there was a disposition?

18         MR. SILVERMAN:  That calculation, as I understand the

19   government's calculation, would not credit it, so it would be

20   lower on a disposition.  And, of course, it doesn't -- it

21   applies enhancements that we would litigate if it got to that

22   point.

23         THE COURT:  Do you know what the government's

24   calculation would be if Mr. Celli accepted responsibility?

25         MR. SILVERMAN:  Yes, your Honor.  And, in fact, I just

L46KCELC

1    flag, in case your Honor wants to allocute Mr. Celli on whether

2    there's ever been a plea offer at any point in this case.  I

3    don't know if this is the time the Court --

4              THE COURT:  I usually do that closer to trial, but it

5    may well be worth doing now.  But keep going.

6              MR. SILVERMAN:  Mr. Celli is prepared to allocute on

7    that, and the government did, in 2019, when Mr. Celli was

8    represented by the Federal Defenders, provide a plea offer that

9    contained a guidelines of 24 to 30 months on a plea.

10             THE COURT:  Is that what you would get if you

11   subtracted three points from the government's 33 to 41?

12             MR. SILVERMAN:  Yes, your Honor.

13             THE COURT:  All right.

14             MS. KARMIGIOS:  Your Honor, I'm sorry, I believe

15   that's the two points, but the third point would be 24 to 30

16   months.  I may have misheard what he said.

17             THE COURT:  Sorry.  I think my question to

18   Mr. Silverman was if you subtracted three points from the

19   offense level that yielded 33 to 41, would you get 24 to 30.

20             MS. KARMIGIOS:  Yes.  Sorry, your Honor, I

21   misunderstood.

22             THE COURT:  He said yes.

23             MS. KARMIGIOS:  Yes, that's correct.

24             THE COURT:  All right.

25             Let's take up a couple of those preliminaries first,

L46KCELC

1    and then we'll move on here.  I think it would be informative

2    just to understand whether there has been a plea offer in the

3    case.  Government, are you prepared to proffer as to any plea

4    offer that has been extended?

5            MS. KARMIGIOS:  Yes, your Honor.  It was before my

6    time, but I've spoken to my predecessor, and I do have

7    information about that plea offer.

8            THE COURT:  Please just put it on the record.

9            MS. KARMIGIOS:  It was in October -- sorry, your

10   Honor.  Just one moment.

11           (Counsel confer)

12           MS. KARMIGIOS:  My apologies, your Honor.  I'm

13   confirming the date that it was extended.

14           It was extended in May of 2019, and it was to plead

15   guilty to the sole count of the indictment.  Would your Honor

16   like me to go through --

17           THE COURT:  Just what the terms of the offer would be.

18           MS. KARMIGIOS:  Sure.

19           THE COURT:  The essential terms.

20           MS. KARMIGIOS:  Excuse me?

21           THE COURT:  The essential terms.

22           MS. KARMIGIOS:  Sure.

23           To plead guilty to the sole count of the indictment,

24   which carries a maximum term of imprisonment of five years, a

25   minimum term of zero years and a supervised release term.  We

L46KCELC

1    calculated the base offense level under 2A6.1(a)(1) as 12, we

2    included a two-point enhancement because the offense involved

3    more than two threats, and a six-point enhancement for official

4    victims those were the enhancements that defense counsel has

5    indicated they would litigate, were we to get to that.

6           And, again, we did account for three acceptance points

7    and getting to a range of 24 to 30 months with a criminal

8    history category of I.

9           THE COURT:  And that proposed plea offer was a firm

10   written plea offer?

11          MS. KARMIGIOS:  Yes, your Honor.

12          THE COURT:  I take it the offer essentially benefits

13   Mr. Celli only insofar as it locks the government in to not

14   taking a more aggressive position of the guidelines, but

15   insofar as there's no count being dismissed, Mr. Celli also, at

16   any given time, would have had the right to plead guilty and

17   reserve all his rights as to how the guidelines applied?

18          MS. KARMIGIOS:  Yes, your Honor.  And also pursuant to

19   the plea agreement, the government would take no position

20   concerning where within the guidelines range the sentence

21   should fall and make no motions for upward departures.

22          THE COURT:  Okay.  Thank you.  That's helpful.

23          What was the disposition of that plea offer?

24          MS. KARMIGIOS:  It's my understanding it was rejected,

25   your Honor.

L46KCELC

1        THE COURT:  Who was defense counsel at the time,

2   Federal Defenders?

3        MS. KARMIGIOS:  Yes.  I believe it was Michael Weil,

4   of the Federal Defenders.

5        THE COURT:  Mr. Silverman, understanding that that

6   came before your time, does that accord with your understanding

7   of the history of plea offers in the case?

8        MR. SILVERMAN:  Yes, your Honor.  I would just note

9   that I think the May date may be -- Ms. Karmigios, neither she

10  nor I were on the case at the time -- I think that may be the

11  date it expired.  It was offered in April.  The reason I note

12  that is there was a change of counsel at precisely that time,

13  so I believe Mr. Celli was represented by both Michael Weil, of

14  the Federal Defenders, and Michael Hueston, of the CJA panel,

15  while the offer was open.

16       THE COURT:  I see.

17       Ms. Karmigios, has there been any other plea offer

18  extended in this case, to your knowledge?

19       MS. KARMIGIOS:  No, there has not, your Honor.

20       THE COURT:  Is that consistent with your

21  understanding, Mr. Silverman?

22       MR. SILVERMAN:  Yes, your Honor.

23       THE COURT:  Mr. Celli, is what has been said correct

24  about the history of plea offers?

25       THE DEFENDANT:  No.  There was supposedly one more in

1    July of this year, July of 2020, but Mr. Taylor lies all the

2    time, so I don't know if it's true or not.

3              THE COURT:  Mr. Taylor?

4              THE DEFENDANT:  Mr. Taylor lied all the time, so I

5    don't know if it was true or not.

6              THE COURT:  Did you ever see anything in writing?

7              THE DEFENDANT:  No.  It was just verbal.

8              MR. SILVERMAN:  Your Honor --

9              THE COURT:  Go ahead, Mr. Silverman.

10             MR. SILVERMAN:  If I may, my understanding is that

11   there were discussions when Mr. Taylor represented Mr. Celli

12   prior to my appointment that were informal in nature, and that

13   Mr. Taylor presented Mr. Celli with an informal suggestion that

14   something might be possible, and it was also rejected, but

15   there was never a formal plea offer at that time.

16             THE COURT:  It was rejected in the sense that what

17   Mr. Taylor floated to Mr. Celli was rejected, but you are not

18   representing that the government, during Mr. Taylor's

19   representation, made another plea offer; is that correct?

20             MR. SILVERMAN:  Correct, your Honor.  There was never

21   a formal offer, that I'm aware of, after the one in 2019.

22             THE COURT:  So, Mr. Celli, understanding that you

23   heard what you heard from Mr. Taylor, did you ever see a

24   written -- second written formal offer?

25             THE DEFENDANT:  No.

L46KCELC

1    THE COURT:  All right.

2    Before we go to the *Faretta* issue, Mr. Silverman, you

3    were the fourth or fifth lawyer, depending on how we count

4    this, in the case, and I think what you were saying to me is,

5    actually, if Mr. Celli could have a lawyer who better suited

6    his interests and said more of what he wanted the lawyer to

7    say, he might be willing to have a successor to you, it's only

8    because he perceives this Court as putting an end to the

9    sequence of lawyers without very just cause that his choice has

10   become you or self-representation.

11   MR. SILVERMAN:  I think that's fair, your Honor, yes.

12   THE COURT:  May I ask you, Mr. Silverman, and I ask

13   you to answer as an officer of the Court, to comment on the

14   state of the attorney-client relationship?  In particular, the

15   question here is:  I understand, given the history, Mr. Celli

16   has had a history with lawyers in civil and criminal cases that

17   have not ended well, period, full stop.  The question is

18   whether there is something really realistically reparable, such

19   that the problem here is about you and him as opposed to any

20   lawyer and him?

21   MR. SILVERMAN:  Your Honor, I don't think the issue

22   here is a breakdown in communications or an inability to work

23   together.  I think the issue is more that Mr. Celli wants to

24   proceed in certain ways that, as an officer of the Court, I am

25   not able to, and that other counsel have expressed this view --

1          THE COURT:  The same view as you?

2          MR. SILVERMAN:  Correct.

3          -- and under those circumstances, Mr. Celli would like

4     to proceed on his own.  But it is not a reflection of a

5     breakdown in communications between Mr. Celli and myself.

6          THE COURT:  It's that there are areas of advocacy that

7     you don't believe you can, consistent with the practice and

8     ethics rules, engage in that he would like you to do, not that

9     there is a loss of respect or communicative ability?

10         MR. SILVERMAN:  Precisely, your Honor.

11         THE COURT:  May I ask you this — and we'll go through

12    the *Faretta* inquiry, because I am eager to take that up with

13    Mr. Celli — but I wonder if there's a place in this process for

14    an ex parte meeting between counsel and the Court to probe some

15    of that?  The reason I say that is that, to the extent that

16    what we're talking about here is defense strategy — Mr. Celli

17    has his visions of defense strategy, you have your views as to

18    what the red lines are here that can't be crossed from an

19    ethics or professional practice or responsible lawyering

20    perspective — the government's not properly privy to that, they

21    should not know what the strategic calls are that the defense

22    team is considering, but that may be important for the Court to

23    hear because I may need to make a determination whether the

24    problem here is, as you describe it, one involving fundamental

25    issues that a lawyer -- a responsible lawyer would place on the

L46KCELC

1  advocacy that can be made on Mr. Celli's behalf as opposed to

2  something personal between present counsel and the client.  It

3  may also be that an ex parte communication in which I probe

4  these issues has a salutary effect to the extent Mr. Celli is

5  listening --

6          THE DEFENDANT:  I'm listening.

7          THE COURT:  -- in hearing the Court assess whether

8  counsel's perceptions are correct about what lines of advocacy

9  would be out of bounds under the rules of evidence.  For

10  example, if you imagine that there is some defense theory that

11  literally is incompatible with the rules of evidence, whatever

12  it would be, and you were to say that to Mr. Celli, he might

13  not be pleased with you for saying that; if I were, upon

14  presentation of it, to find that you are right about that,

15  perhaps that would have a salubrious effect on the relationship

16  because it's not you, it's the umpire saying that that's just

17  not allowed.

18          MR. SILVERMAN:  Everything your Honor said makes

19  perfect sense, and we have absolutely no objection to an

20  ex parte proceeding along the lines of what your Honor just

21  proposed.

22          THE COURT:  All right.

23          Here's, then, what I would propose to do:  Let me go

24  through the *Faretta* inquiry with Mr. Celli — I want him to

25  understanding the implications of the request — but it may well

L46KCELC

1    be after that inquiry, that we schedule a conference,

2    presumably for next week, at which we can follow this up after

3    you've had a little time with Mr. Celli because I want to make

4    sure that the way you see things is correct, which is to say,

5    the issue is about the range of motion that any lawyer would

6    have relative to the requests that Mr. Celli is making of the

7    lawyer in terms of courtroom ethics.

8              MR. SILVERMAN:  Yes, your Honor.

9              THE COURT:  I just want to make sure, that's a

10   sensible way to approach?

11             MR. SILVERMAN:  Yes, your Honor.

12             THE COURT:  Government counsel, what's your view about

13   that, just as a process?

14             MS. KARMIGIOS:  No objection from me, your Honor.

15             THE COURT:  All right.  So let's go through the

16   *Faretta* inquiry, and we'll see where we go with that.

17             Mr. Smallman, would you kindly place Mr. Celli under

18   oath.

19             (Defendant sworn)

20             THE COURT:  Mr. Celli, do you understand that you're

21   now under oath, and that that means that any false statement

22   you make may subject you to --

23             THE DEFENDANT:  Another trial.

24             THE COURT:  -- another prosecution for the crime of

25   perjury?

L46KCELC

 1          THE DEFENDANT:  Yes, your Honor.

 2          THE COURT:  I'm going to ask you some questions at the

 3  beginning that I know the answer to, it's just a matter of

 4  making a clear record, so don't treat it as ignorance, and you

 5  will see why with the very first question.

 6          What is your name?

 7          THE DEFENDANT:  Lucio Celli.

 8          THE COURT:  How old are you?

 9          THE DEFENDANT:  Forty-five.

10          Forty-five.

11          THE COURT:  How far did you go in school, Mr. Celli?

12          THE DEFENDANT:  I have a Master's degree.

13          THE COURT:  What is your Master's in?

14          THE DEFENDANT:  Special ed.

15          THE COURT:  When did you receive a Master's?

16          THE DEFENDANT:  2002.

17          THE COURT:  Where did you get the Master's?

18          THE DEFENDANT:  Touro College.

19          THE COURT:  Good for you.

20          Did you teach in the public school system?

21          THE DEFENDANT:  Yes, I did.

22          THE COURT:  Good for you.  I have great admiration for

23  the teachers in our public school system.  I'm the child of

24  one.

25          Are you presently under the care of a psychiatrist or

L46KCELC

1    a doctor?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Without going into great detail, can you

4    describe at a high-level what that -- just in a few sentences,

5    what the nature of the care is for?

6              THE DEFENDANT:  For anxiety and PTSD.

7              THE COURT:  How long have you been under that care?

8              THE DEFENDANT:  Currently?  Since -- the current

9    doctor, since January.

10             THE COURT:  And prior to that doctor, had there been

11   other doctors?

12             THE DEFENDANT:  Yes, other doctors.

13             THE COURT:  Let me just finish the question, just so

14   it's clear on the record what I'm asking.

15             Prior to that doctor, had you been treated by other

16   doctors for the same or similar conditions?

17             THE DEFENDANT:  Yes.

18             THE COURT:  How long did that go back?

19             THE DEFENDANT:  On and off for about ten years.

20             THE COURT:  Are you on any medication for any of those

21   conditions?

22             THE DEFENDANT:  Mostly Klonopin.  I take it for --

23   Lorazepam, whatever it's called.  Lamictal.  I was taken off of

24   Buspar because I was on it for a while.  And there's one more,

25   I don't remember the name.

L46KCELC

1              THE COURT:  Do those medications affect your ability

2      to think clearly?

3              THE DEFENDANT:  No.

4              THE COURT:  Is your mind clear today?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Other than what we've just discussed, have

7      you received any medical care for any mental illness?

8              THE DEFENDANT:  Just what I described.

9              THE COURT:  Nothing else than the conditions you

10     described a moment ago?

11             THE DEFENDANT:  No.

12             MR. SILVERMAN:  Your Honor, may I have a moment?

13             THE COURT:  Of course.

14             (Defendant and counsel conferred)

15             THE DEFENDANT:  My lawyer instructed me to tell you

16     about I've seen a mental health expert, Eric Arnold, currently

17     a social worker, Gordon Weiss, and a therapist at Rockland

18     Daytop.

19             THE COURT:  Have you ever received care at a

20     hospital -- other than what you've described, have you received

21     any other care, including in a hospital, for any mental health

22     problem?

23             THE DEFENDANT:  Not that I remember.

24             THE COURT:  In the past 24 hours, other than what

25     you've just described to me, have you taken any medicine,

L46KCELC

1    pills, or drugs of any kind?

2          THE DEFENDANT:  I took Klonopin, Lorazepam — whatever,

3    I forget what the name brand is — and Lamictal.

4          THE COURT:  In the last month, have you used alcohol

5    or any illegal drugs?

6          THE DEFENDANT:  No.

7          THE COURT:  And, again, your mind is clear today, you

8    said.  Do you understand what the nature of this proceeding is?

9          THE DEFENDANT:  Yeah, well, you've rendered your

10   decision on the in limine, and now we're doing the *Faretta*,

11   *California v. Faretta* hearing.

12         THE COURT:  Just tell me, then, in your own words,

13   because we lawyers throw around case names willy-nilly, what do

14   you understand the purpose of what we're engaged in?

15         THE DEFENDANT:  I haven't read the decision in quite

16   some time.  I know it's for pro se.  That's all of my

17   recollection of the opinion is.

18         THE COURT:  Putting aside the opinion, what do you

19   understand the purpose of the conversation I had with

20   Mr. Silverman, and now the conversation I'm having with you,

21   what's the purpose of that, as you understand?

22         THE DEFENDANT:  Well, for you to ascertain whether or

23   not I am competent enough to defend myself and whether I'll

24   comport myself in a certain way.  That's what I assume.

25         THE COURT:  From my perspective, the purpose of this

L46KCELC

1   inquiry is prompted by your request --

2           THE DEFENDANT:  Oh, okay.

3           THE COURT:  -- for leave to represent you.

4           THE DEFENDANT:  Oh, yes, my request.  I'm thinking

5   about what we're doing right now.

6           THE COURT:  Well, that's -- I see, yes, immediately in

7   the last few minutes, I'm assessing your competence, but in

8   terms of the broader purpose of the whole line of questions

9   that I've just begun on, do you understand what the purpose of

10  this whole --

11          THE DEFENDANT:  Yeah, my request to go pro se.

12          THE COURT:  Okay.

13          Are you aware that you have a right, under the

14  Constitution, to have an attorney represent you at a criminal

15  trial?

16          THE DEFENDANT:  Yes.  Under the Sixth Amendment, yes.

17          THE COURT:  Do you understand that you have the right,

18  as well, to represent yourself in this criminal case, including

19  at the trial?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Have you ever attended law school?

22          THE DEFENDANT:  No.

23          THE COURT:  Have you ever studied law?

24          THE DEFENDANT:  Informally.

25          THE COURT:  What does that mean?

L46KCELC

1           THE DEFENDANT:  Oh, well, you know, I -- not

2    currently, but, you know, while I was in jail, I did

3    LexisNexis.  Prior to not being deprived of the internet, I did

4    case texts.  I read law journals on various topics.  You know,

5    I've downloaded them.  I've printed them out, so I can have

6    them.

7           THE COURT:  Have you ever taken a class --

8           THE DEFENDANT:  No.

9           THE COURT:  -- in the law?

10          Even apart from being at law school as an

11   undergraduate or anything like that, even at high school, have

12   you ever taken a class in the law?

13          THE DEFENDANT:  I mean, there's been sections on bench

14   law, but that's about it, but nothing...

15          THE COURT:  There's been no class you've ever taken at

16   any level that was about the law; is that correct?

17          THE DEFENDANT:  No, not specifically.

18          THE COURT:  My statement was correct?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Okay.  All right.

21          I think I know the answer to this, but I need you to

22   answer.  Have you ever represented yourself in any legal

23   proceeding?

24          THE DEFENDANT:  Yes.

25          THE COURT:  What legal proceeding was that?

1          THE DEFENDANT:  Civil.

2          THE COURT:  Which case or cases?

3          THE DEFENDANT:  The one before Judge Brodie and the

4     one before Judge Cogan.

5          THE COURT:  Did you represent yourself for the

6     entirety of those proceedings or only part?

7          THE DEFENDANT:  With Judge Cogan, I had a private

8     attorney that I fired, and then with Judge Brodie, it was all

9     by myself.

10          THE COURT:  All what?

11          THE DEFENDANT:  All by myself.

12          THE COURT:  Let's focus on the case in front of Judge

13     Brodie.

14          What was the experience like representing yourself in

15     front of Judge Brodie?

16          THE DEFENDANT:  The one time that I saw her in person,

17     she was pleasant, nice person.  That's how I would describe

18     her.

19          THE COURT:  How did you find the act of carrying out

20     the functions of a lawyer as a nonlawyer in that case?

21          THE DEFENDANT:  I wasn't focused on -- I was just

22     focused on Betsy, so I don't know what to tell you.

23          THE COURT:  You were focused on?

24          THE DEFENDANT:  I was focused on Ms. Combier.

25          THE COURT:  She was your adversary?

1              THE DEFENDANT:  Yes.

2              THE COURT:  Right.  But if you had a case, you were

3    the plaintiff in that case in front of --

4              THE DEFENDANT:  I was the defendant, and I did a

5    cross-complaint.

6              THE COURT:  Okay.  In those capacities, did you have

7    to file legal papers?

8              THE DEFENDANT:  Oh, yeah, definitely.

9              THE COURT:  Either on your own or in response to the

10   other side?

11             THE DEFENDANT:  Yes, I did.

12             THE COURT:  How did you find that project?  How did

13   you find -- was that hard, were you able to accomplish what you

14   needed?

15             THE DEFENDANT:  I think so.  You know, whether I did

16   it right or wrong is another question.

17             THE COURT:  Did you ever have to give an argument in

18   court or --

19             THE DEFENDANT:  No.

20             THE COURT:  -- were you simply submitting papers?

21             THE DEFENDANT:  Just submitting papers.

22             THE COURT:  Did you ever have occasion in the case in

23   front of Judge Brodie to make an oral presentation to her about

24   an issue in the case?

25             THE DEFENDANT:  She never required me; she only

L46KCELC

1        required it of Ms. Combier.

2                 THE COURT:  So the extent of your functioning in the

3        role of a pro se lawyer was limited to the submission of

4        papers; is that correct?

5                 THE DEFENDANT:  Yep.

6                 THE COURT:  May I ask you what the outcome of the case

7        was?

8                 THE DEFENDANT:  Dismissed.

9                 THE COURT:  Well, you said that there were claims in

10       both directions.  What happened to the claims against you?

11                THE DEFENDANT:  Dismissed.

12                THE COURT:  And what happened to the claims you

13       brought?

14                THE DEFENDANT:  It was dismissed.

15                THE COURT:  From the way -- did the judge write a

16       decision that dismissed all the claims?

17                THE DEFENDANT:  Repeat that, your Honor.

18                THE COURT:  How did it come to pass that the claims

19       were dismissed?

20                THE DEFENDANT:  Judge Brodie asked for Magistrate Mann

21       to write a report, and she adopted that one.

22                THE COURT:  I see.

23                And did Judge Mann's report recommend dismissal of

24       everybody's claims?

25                THE DEFENDANT:  Yes, I believe so.

L46KCELC

1          THE COURT:  Did Judge Mann's report say anything about

2     the arguments you had made either on your other side's claims

3     or in support of your claims?

4          THE DEFENDANT:  If I say anything, I would -- I don't

5     remember.  Honestly, she dismissed them, but I don't know the

6     exact wording, I don't know what was said.  I don't remember.

7          THE COURT:  Mr. Celli, again, under oath, I'm just

8     trying to get a real feel on this.  How comfortable did you

9     feel with legal materials, making arguments about cases, and

10    rules, and evidence?  How comfortable did you feel doing that

11    in that case?

12         THE DEFENDANT:  Well, based on what I've read, and

13    like I got annotated rules of evidence, I got annotated rules

14    of discovery -- not discovery -- rules of criminal procedure,

15    obviously, I read what I read, and then I assume that that's

16    the argument I will make and that I believe that's the right

17    argument.

18         THE COURT:  Did you feel, at times, that there were

19    concepts that you had difficulty understanding, legal concepts?

20         THE DEFENDANT:  No.

21         THE COURT:  Tell me about the case in front of Judge

22    Cogan.  You said you had a private attorney --

23         THE DEFENDANT:  Yes.

24         THE COURT:  -- who you fired.

25         Briefly, what was the nature of the case in front of

L46KCELC

1    Judge Cogan?

2              THE DEFENDANT:  It was a Title 7.

3              THE COURT:  And that's a case where you were the

4    plaintiff, right?

5              THE DEFENDANT:  Yep.

6              THE COURT:  And you sued -- who did you sue again?

7              THE DEFENDANT:  The DOE.

8              THE COURT:  And who was your attorney?

9              THE DEFENDANT:  Steve Morelli, and then it changed to

10   Mr. Tann because Morelli was arrested, and he was -- whatever.

11             THE COURT:  So I take it you didn't fire Mr. Morelli,

12   he was forced to step down?

13             THE DEFENDANT:  Yes.

14             THE COURT:  And then you hired a Mr. Tann.

15             THE DEFENDANT:  Well, Mr. Tann took over the firm.

16             THE COURT:  I see.  And you fired Mr. Tann?

17             THE DEFENDANT:  Because of the ongoings between Betsy,

18   Randi, and my lawyer, which I had audio recordings.

19             THE COURT:  I lost the word.

20             THE DEFENDANT:  The dealings with Betsy, Randi, and my

21   lawyer.

22             THE COURT:  You thought there was something corrupt

23   about those dealings?

24             THE DEFENDANT:  Basically from what Betsy told me,

25   yes.

L46KCELC

1          THE COURT:  Okay.  So, for that reason, you fired

2     Mr. Tann?

3          THE DEFENDANT:  Yes, because he lied to me.  He said

4     that -- he said that the people at the Department of Ed had

5     immunity, and then I told him that's not up to him to decide,

6     that's up to the court to decide, whether employees have

7     qualified immunity.  It wasn't up to him to decide not to put

8     it in, it was up to --

9          THE COURT:  The judge?

10         THE DEFENDANT:  -- the judge.

11         THE COURT:  So what was the stage of the case -- where

12    was the case at when you fired Mr. Tann?

13         THE DEFENDANT:  From the beginning, basically.

14         THE COURT:  What happened afterwards?  What were the

15    stages of the case after Mr. Tann left?

16         THE DEFENDANT:  The city moved for, I believe what's

17    called, summary judgment.  I believe that's what the motion

18    was.  I'm not remembering.  It's been quite some time.

19         THE COURT:  And what happened next?

20         THE DEFENDANT:  Judge Cogan said that the UFT had

21    nothing to do with this, and it had everything to do it.

22         THE COURT:  Judge Cogan granted summary judgment to

23    the defense?

24         THE DEFENDANT:  Yes.

25         THE COURT:  And was any discovery taken in the case?

L46KCELC

1          THE DEFENDANT:  Nope.

2          THE COURT:  No depositions?

3          THE DEFENDANT:  Nope.

4          THE COURT:  No evidence?

5          THE DEFENDANT:  Nope.

6          THE COURT:  Did you, when you were representing

7   yourself, initiate any discovery, seek to take any discovery?

8          THE DEFENDANT:  I didn't know anything about that at

9   that point.  I was rushing through -- rushing to learn whatever

10  because of what was occurring.  So I was behind the eightball.

11  Not that I know a lot now, but I know a little bit more than

12  what I knew then.

13         THE COURT:  Look, you fired Mr. Tann, you were behind

14  the eightball, you didn't take discovery, and, therefore, no

15  discovery was taken, and Judge Cogan, based on that record,

16  entered summary judgment for the defense.  Is that an accurate

17  summary?

18         THE DEFENDANT:  Yes, that's accurate.

19         THE COURT:  Do you believe that if you had taken

20  discovery, that might have put you in a better position to

21  either prevail or at least get beyond summary judgment?

22         THE DEFENDANT:  If I were to present my evidence and

23  obtain evidence, probably, yes.

24         THE COURT:  Suppose you had been more familiar with

25  the law and practice, if you had, after Mr. Tann stepped aside

L46KCELC

1   or was fired, taken discovery, do you think if you had done

2   that, your case might have survived longer?

3          THE DEFENDANT:  So, what I think now, under the full

4   credit -- under the full fair credit amendment, or whatever,

5   from the highest court, because I mentioned them in my

6   complaint, I believe I could have filed a Rule 60, but --

7          THE COURT:  Sorry, I'm asking you just a question.

8   You very honestly said to me you were not familiar with what

9   the --

10          THE DEFENDANT:  Yes.

11          THE COURT:  -- how to proceed, and sometime

12   thereafter, you lose the case.  And the actual question,

13   particularly given the nature of this proceeding, is:  If you

14   had been more up on the law, if you had been better at legal

15   practice, after Mr. Tann dropped away, do you think your case

16   would have survived a little longer?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Okay.

19          Apart from this case, have you ever been a defendant

20   in a criminal case?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Tell me about that.

23          THE DEFENDANT:  Two of them got dismissed and one of

24   them ended in a violation.

25          THE COURT:  Can you elaborate, just take them one by

L46KCELC

1    one, and tell me what the case was about and what happened?

2            THE DEFENDANT:  The first two were possession of

3    marijuana, supposedly, and I got an ACD to both, and the second

4    one, I was misadvised by my attorney who I hired, and that

5    ended in a violation.

6            THE COURT:  When you said you were misadvised by your

7    attorney, can you elaborate what you mean by that?

8            THE DEFENDANT:  Well, in order to convict for a DUI,

9    you have -- the prosecutor, the DA, has to prove that (a) you

10   took the substance or -- and then there's four elements — I

11   don't remember the third and fourth — and the second one is

12   that you drove.  Obviously, the second one is always proveable,

13   but the first one is what needed to be established.  I tested

14   negative, so...

15           THE COURT:  Got it.

16           Was there any proceeding in any of the criminal cases

17   you had where you represented yourself at any point?

18           THE DEFENDANT:  No, not in that one.  Well, for a

19   couple of months, but not really.

20           THE COURT:  Did any of those cases result in a trial?

21           THE DEFENDANT:  No.

22           THE COURT:  Did any of those cases come close to being

23   at a trial?

24           THE DEFENDANT:  No.

25           THE COURT:  Did any of those cases involve any

L46KCELC

1    evidentiary hearing?

2            THE DEFENDANT:  Nope.

3            THE COURT:  Did any of those cases involve the

4    questioning in court of any witness?

5            THE DEFENDANT:  Nope.

6            THE COURT:  Did any of those cases involve oral

7    argument by a lawyer in court?

8            THE DEFENDANT:  There was one, and I wasn't privy to

9    it.  They went into another room.

10           THE COURT:  Have you ever attended a criminal trial?

11           THE DEFENDANT:  No.

12           THE COURT:  Have you ever served as a juror sitting as

13   a juror in a trial?

14           THE DEFENDANT:  I was selected, but the case settled.

15           THE COURT:  Okay.

16           Other than that jury duty occasion, have you ever

17   served as a juror?

18           THE DEFENDANT:  No.

19           THE COURT:  Have you ever seen jury selection

20   conducted?

21           THE DEFENDANT:  Not personally, no.

22           THE COURT:  Are you familiar with the Federal Rules of

23   Evidence?

24           THE DEFENDANT:  Well, I have an annotated book.

25           THE COURT:  I'm holding up the 2019 Federal Criminal

L46KCELC

1    Code, but there is a section in here that is the Federal Rules

2    of Evidence.  Are you familiar with those?

3              THE DEFENDANT:  I have a whole book that's probably

4    that size.

5              THE COURT:  Okay.  But having -- I've got a lot of

6    whole books that I'm not familiar with.  Are you familiar with

7    the Federal Rules of Evidence, not only a book?

8              THE DEFENDANT:  I've read certain passages.  I haven't

9    read all of them.

10             THE COURT:  What is your level of familiarity with the

11   rules?

12             THE DEFENDANT:  From the ones I focused on, the 400

13   and the 800, they seem straightforward to me.

14             THE COURT:  They seem straightforward to you?

15             What are the Rule 800 rules about?

16             THE DEFENDANT:  Well, you just went over them.

17             THE COURT:  I'm --

18             THE DEFENDANT:  Sorry, sorry, sorry.

19             THE COURT:  It's not about me.  I know those rules; I

20   could represent myself.

21             THE DEFENDANT:  Yes.

22             THE COURT:  That's not what this is about.  This is

23   about you.  What are the Rule 800 rules about?

24             THE DEFENDANT:  Admission of statements --

25             THE COURT:  No, no, don't look it up.  I'm asking you,

L46KCELC

1    because I'm trying to get a sense of whether you can represent

2    yourself at trial without a disaster happening.

3             What do the 800 rules relate to?

4             THE DEFENDANT:  Admissions of statements, out-of-court

5    statements.

6             THE COURT:  Out-of-court statements, all right.

7             Do you have -- that's a series of rules that comes up

8    a great deal during a trial.

9             THE DEFENDANT:  Yes.

10            THE COURT:  Is there anything further you can tell me

11   about what the rules say, those rules?

12            THE DEFENDANT:  I don't have them set to memory.  I

13   have it in here.

14            THE COURT:  I'm not asking you from memory, but I am

15   trying to get a sense of whether you have any facility with

16   them at all.  I appreciate that you've read something there,

17   but could you even give me 30 seconds of knowledge about the

18   Rule -- what you are calling the Rule 800 rules?

19            THE DEFENDANT:  So, they deal with conspiracy,

20   statements of conspirators.  They deal with opposing statements

21   from opposing parties, whether it's from the defendant or from

22   the government.  What's the other two?  I'm blanking out.  I

23   can't tell you more than that.

24            THE COURT:  What do the 400 rules relate to?

25            THE DEFENDANT:  I don't remember that at all.

L46KCELC

```
1              THE COURT:  All right.

2              What about the Federal Rules of Criminal Procedure, is

3     that something that you have any familiarity with?

4              THE DEFENDANT:  Yes.  Like -- so Rule 12 is, like, for

5     dismissal.  That's what I see in my mind, but I just don't

6     remember them off -- I have them.  I don't remember off the top

7     of my head.

8              THE COURT:  Do you understand that your lawyer is

9     familiar with the Federal Rules of Evidence?

10             THE DEFENDANT:  Oh, definitely.

11             THE COURT:  Do you understand that your lawyer is

12    familiar with the Federal Rules of Criminal Procedure?

13             THE DEFENDANT:  Oh, definitely.

14             THE COURT:  Do you understand that we will follow

15    closely both sets of those rules at trial?

16             THE DEFENDANT:  Yes.

17             THE COURT:  And do you understand that, ultimately,

18    the decisions that a judge makes are supposed to be guided by

19    those rules to make sure that there is an objective set of

20    standards and rules that governs a trial, and it's not by whim

21    or caprice?  That's what I'm supposed to do, that's my job.

22             Do you understand that?

23             THE DEFENDANT:  Yes.

24             THE COURT:  And do you understand, therefore, that

25    throughout a trial, I am either asking the lawyers for their
```

L46KCELC

1    views as to how certain rules apply, for example, certain

2    evidence or certain requests, or the lawyers, on their own

3    initiative, are bringing to my attention their perspectives as

4    to how certain rules apply?

5           Do you understand that?

6           THE DEFENDANT:  Oh, that's what they did right now,

7    yes, all five of us.

8           THE COURT:  But do you understand that in a

9    fast-moving trial, if a witness was over here in the witness

10   stand, and the government put a document in front of them and

11   asked a question to that witness, your lawyer might get up and

12   say, Judge, Rule 801, or Rule 403, or might make a short

13   argument as to why something the government is doing, Rule 609,

14   is inappropriate?  Do you understand that that's very much the

15   work of the lawyer --

16          THE DEFENDANT:  That's the practice.

17          THE COURT:  -- in a trial, it's about applying a

18   fairly dense set of rules of evidence to a fast-moving set of

19   situations, and the lawyer is essentially quickly decoding what

20   has just happened and interpreting it in the light of the rules

21   of evidence?

22          Do you understand that that's the job of the trial

23   lawyer?

24          THE DEFENDANT:  Yeah, that's the craft they have, and

25   they've honed it.  They've worked a trial more than once, so

L46KCELC

1    they've honed their skills.  That's their craft.

2            THE COURT:  Indeed.  Look, I will tell you before I

3    took the bench, that's what I used to do, and it's not

4    something that you learn doing one trial, it's many, and you

5    get more and more comfortable.  There is a point like writing a

6    bicycle or learning a foreign language where you feel like

7    you've achieved fluency, but you always get better, but it's a

8    longer and arduous process informed by experience.

9            Do you understand that?

10           THE DEFENDANT:  Yes.

11           THE COURT:  Do you have any experience that would

12   qualify you to do that?

13           THE DEFENDANT:  Well, I do that as a teacher.  I make

14   quick assessments, and quick judgments, and responses to what

15   happens in my room.

16           THE COURT:  Sure.  And I appreciate that.  All of us

17   in our own lives have to think fast in our own ways.

18           THE DEFENDANT:  Yeah.

19           THE COURT:  But this is a unique vocabulary.  And, for

20   example, if you simply got up and said I object, as a judge, I

21   would then need to say rule, what basis.  Do you have anything

22   in your experience that would enable you to answer that next

23   question — what basis, what rule?

24           THE DEFENDANT:  That -- that would be my own account

25   because --

L46KCELC

```
 1              THE COURT:  That's a handicap.

 2              THE DEFENDANT:  Yes, I know it's a handicap.

 3              THE COURT:  It's not a handicap like a stroke for a

 4     golfer.  That's like being blind for a golfer.  You need to be

 5     able to see what's going on.  If you don't know the rules, if

 6     the government is offering something that's inadmissible under

 7     the rules, unless I catch it on my own, you would not be of any

 8     assistance to me if you were representing yourself.

 9              Do you understand that?

10              THE DEFENDANT:  Yes.

11              THE COURT:  Do you understand that an attorney, by

12     study and experience, is far better able to follow and apply

13     those rules than you are?

14              THE DEFENDANT:  Yes.

15              THE COURT:  Mr. Celli, if you were to represent

16     yourself, would you have some game plan between now and trial

17     to suddenly put yourself in the position where you could do

18     what it takes experienced lawyers years to do in terms of

19     having the skill set to ably defend against inadmissible

20     evidence, or improper arguments, or to admit evidence, or to

21     make proper arguments?  How in the weeks between now and trial

22     would you learn those skills?

23              THE DEFENDANT:  Read and reread all the books I have.

24              THE COURT:  Do you understand that your criminal trial

25     will begin on May 17th of this year?
```

L46KCELC

1      THE DEFENDANT:  Yes, but I have a request because --

2 but we'll deal with that after.

3      THE COURT:  Do you understand that I have identified

4 the May 17th trial date as a firm trial date?  This case

5 involves an event that allegedly happened on November 12th of

6 2018, which would be two and a half years and five days before

7 the trial date.

8      Do you understand that?

9      THE DEFENDANT:  Yes.

10      THE COURT:  All right.

11      Do you understand that the one count against you will

12 be tried then, and that a jury will decide whether you are

13 guilty of that crime?

14      THE DEFENDANT:  Yes.

15      THE COURT:  And do you understand that, just to be

16 concrete about what the crime is, Count One, the only count in

17 the indictment, charges you with transmitting interstate

18 threats to injure a person of another in violation of a statute

19 called Title 18, United States Code, Section 875(c)?

20      THE DEFENDANT:  Yes.

21      THE COURT:  Do you understand that that crime is a

22 felony?

23      THE DEFENDANT:  Yes.

24      THE COURT:  And do you understand that the maximum

25 offense for that count in terms of imprisonment is five years

L46KCELC

1   in prison?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Do you understand that apart from

4   imprisonment, if you're convicted of that crime, the offense

5   carries other potential penalties?

6              THE DEFENDANT:  Yes.

7              THE COURT:  Do you understand that, for example, the

8   Court can impose a fine of the greatest of $250,000, twice the

9   gross pecuniary loss to another person, or twice the gross

10  pecuniary gain to you?  Presumably that means $250,000, given

11  the nature of the crime, but do you understand that apart from

12  losing your liberty for up to five years, you could lose a lot

13  of money?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Do you understand, as well, that the crime

16  carries a special assessment of $1,000?

17             THE DEFENDANT:  Yes.

18             MS. KARMIGIOS:  $100.

19             THE COURT:  $100, I'm sorry, my bad.

20             Sorry, thank you.

21             And do you understand, as well, that following any

22  term of imprisonment, the Court would have the authority to

23  impose a term of supervised release, which would mean that you

24  would be under court supervision potentially for a period of

25  several years?

L46KCELC

1           THE DEFENDANT:  Yes.

2           THE COURT:  Do you understand that if you were

3    convicted at a trial, one of the factors that a judge would

4    have to consider in deciding a just and reasonable sentence

5    would be what are called the sentencing guidelines?

6           THE DEFENDANT:  Yes.

7           THE COURT:  Have you discussed the sentencing

8    guidelines with Mr. Silverman?

9           THE DEFENDANT:  No, but I've read them and -- I've

10   read them.  I printed it out while I was in jail.

11          THE COURT:  Do you understand that if you were to

12   represent -- go ahead.

13          THE DEFENDANT:  Oh, yes, yes.  Sorry, yes.

14          THE COURT:  Yes, what?

15          THE DEFENDANT:  I did discuss them.

16          THE COURT:  I was surprised to hear that you hadn't.

17          THE DEFENDANT:  I'm sorry.

18          THE COURT:  That's okay.  All right.

19          Do you understand that if you were to represent

20   yourself, it's not my job, as the judge, to advise you how to

21   try your case?

22          THE DEFENDANT:  Yes.

23          THE COURT:  I'm trying to be solicitous of your

24   interests here, but, in the end, during a trial, I'm a neutral,

25   and I can't tell you, you know, it would be better if you

L46KCELC

1    cross-examined that witness on the following; I can't do that,

2    it's not my job.

3              THE DEFENDANT:  No, it's not.  It's your job to be

4    nonbiased.

5              THE COURT:  Do you understand that the rule of

6    self-representation, where granted, is not a license to abuse

7    the dignity of the courtroom, it's not a license not to comply

8    with the relevant rules of procedure or substantive law, you

9    need to abide by all the rules?

10             Do you understand that?

11             THE DEFENDANT:  Yes.

12             THE COURT:  And if I tell you that a question is

13   improper or a statement is improper, you need to abide by the

14   Court's rulings or you are risking having your line of inquiry

15   shut down and risking potentially being held in contempt.  Do

16   you understand that?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Do you understand that the Court may

19   terminate a defendant's self-representation if the defendant

20   deliberately engages in serious and obstructive misconduct?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Do you understand that the government has

23   the obligation at trial to prove you guilty through the use of

24   admissible evidence and beyond a reasonable doubt?

25             THE DEFENDANT:  Yes.

1          THE COURT:  Do you understand that you have no

2     obligation to prove that you are innocent?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Do you understand that you have no

5     obligation to put on any evidence at trial?

6          THE DEFENDANT:  Yep.

7          THE COURT:  Do you understand, however, that you also

8     have the right to object to the government's evidence based on

9     the rules of evidence, and to cross-examine the government's

10    witnesses, compliant with the rules of evidence?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Have you ever questioned a witness in any

13    court or hearing of any sort?

14         THE DEFENDANT:  Nope.

15         THE COURT:  Have you ever testified in any proceeding?

16         THE DEFENDANT:  No.

17         THE COURT:  Do you understand that you would have the

18    right to call your own witnesses, offer evidence, and subpoena

19    witnesses to come to court and testify on your behalf?

20         THE DEFENDANT:  Yeah.

21         THE COURT:  Do you know how to do that?

22         THE DEFENDANT:  No.

23         THE COURT:  Do you understand that, at a trial, you

24    would have the right to take the stand, and under oath, testify

25    in your own defense?

L46KCELC

1          THE DEFENDANT:  Yes.

2          THE COURT:  Do you understand, however, that you also

3     have the right not to testify --

4          THE DEFENDANT:  Yes.

5          THE COURT:  -- and if you don't testify, I will

6     instruct the jury that they are not to hold that decision

7     against you in any way?

8          THE DEFENDANT:  Yes.  And the prosecutor can't make

9     any comments about it.

10          THE COURT:  Right.

11          Do you understand that if you want to tell — this is

12     very important — if you want to tell the jury your version of

13     events in your own words, the only way you can do that is to

14     take the stand and testify in your own behalf under oath?

15          THE DEFENDANT:  Yes.

16          THE COURT:  In other words, if you were representing

17     yourself at trial, and you didn't expose yourself to

18     examination by the government, you couldn't, then, get up in

19     your jury address and say let me tell you what happened; you

20     can't do that, you can only comment on the evidence that's been

21     received at trial.  Do you understand that?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Do you understand that by acting as your

24     own attorney at trial, the jury may draw inferences about you

25     as a person and about what you did in this case or know about

L46KCELC

1    the events of this case that they would not be able to draw if

2    an attorney represented you at trial?

3                THE DEFENDANT:  Yes.

4                THE COURT:  Do you understand that?

5                THE DEFENDANT:  Yes.

6                THE COURT:  Even if you don't take the stand at trial

7    and testify as a witness, you understand that the rights you

8    have as a criminal defendant, including the right to remain

9    silent under the Fifth Amendment, may be undermined because the

10   jury may draw impressions about you because of how you chose to

11   conduct your defense at trial?

12               THE DEFENDANT:  I've read that, yes.

13               THE COURT:  Do you understand that that is correct,

14   that a jury might draw negative inferences about a defendant

15   based on the way he or she conducted himself or herself?

16               THE DEFENDANT:  Yes, of course.  I -- the D.C. Circuit

17   Federal Defenders have a whole thing about pro se people and

18   the way juries respond to it.

19               THE COURT:  You understand that that would be a risk

20   for a pro se defendant?

21               THE DEFENDANT:  Yes.

22               THE COURT:  Do you understand that proceeding pro se

23   may undermine your attempt to establish a defense?

24               THE DEFENDANT:  Yes.

25               THE COURT:  What types of evidence do you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L46KCELC

1    understand -- well, no, let me just ask the government.

2            Government, in category, what types of evidence will

3    you be offering, do you expect to offer at trial?

4            MS. KARMIGIOS:  We'll be offering testimony from the

5    United States Marshals, documentary evidence in the form of

6    emails -- I'm sorry, your Honor, can you hear me -- testimony

7    from United States Marshals, as well as emails and other

8    documentary evidence, including the limited evidence about the

9    civil litigations that your Honor has ruled on.

10           THE COURT:  I take it there would also be, from what

11   we covered earlier, the postarrest statement?

12           MS. KARMIGIOS:  Yes, your Honor.

13           THE COURT:  And postarrest prison calls?

14           MS. KARMIGIOS:  Yes, your Honor.

15           THE COURT:  All right.

16           Do you understand, Mr. Celli, that an attorney would

17   have experience and skill in objecting to aspects of that

18   evidence and cross-examining the witnesses, skills that you do

19   not have?

20           THE DEFENDANT:  Yes.

21           THE COURT:  Do you understand that an attorney is

22   skilled at cross-examining government witnesses, examining

23   their motives to testify, examining perhaps their prior bad

24   acts, exposing their prior inconsistent statements, offering --

25   drawing out things that they know that are helpful to your

L46KCELC

1    case?

2           Do you understand that a skilled attorney knows how to

3    do those things?

4           THE DEFENDANT:  Yes.

5           THE COURT:  Do you understand that attorneys know how

6    to ask these questions without drawing information out that

7    would hurt you, and that they're in a position to make

8    judgments about when it's better to stay mum and not ask a

9    question because the answer may hurt you?

10          Do you understand that that's part of an attorney's

11   skill set?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Do you understand that if you did ask

14   questions of government witnesses, you run the risk that the

15   jury may assume that you know or did certain things because of

16   the type of questions you asked?

17          THE DEFENDANT:  Yes.

18          THE COURT:  In other words, an attorney can do certain

19   things without creating the same potential inference about what

20   you knew than might exist if you put the same question or a

21   question like it to a witness?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Do you understand that if you're convicted

24   at trial, you will have the right to appeal that conviction?

25          THE DEFENDANT:  Yes.

1          THE COURT:  And do you understand that often,

2     convicted defendants complain on appeal that their attorneys

3     didn't represent them well enough at trial?

4          THE DEFENDANT:  And I even read a case where someone

5     who was allowed to represent themself pro se appealed to the

6     Second Circuit because they were -- that the attorney's

7     ineffective, like -- they went through this whole thing and

8     then they said they were ineffective, which I think that person

9     should have gotten over...

10         THE COURT:  Look, let me be as blunt as I can.

11    Defendants often say that they deserve a new trial on appeal

12    because their attorney made an error at trial or failed to do

13    something during the trial that he or she should have done.

14         Do you understand that that's a very common point of

15    attack for a defendant who's been convicted on appeal?

16         THE DEFENDANT:  Yes.

17         THE COURT:  And do you understand that if you

18    represented yourself at trial, that argument would be lost to

19    you?  You would not be able to blame an attorney for a trial

20    error if you represented yourself, an attorney did not

21    represent you at trial.  Do you understand that?

22         THE DEFENDANT:  Yes.

23         THE COURT:  And do you understand that if you

24    represent yourself at trial and are convicted, you will not be

25    able to complain on appeal that you should have had a lawyer?

L46KCELC

1                THE DEFENDANT:  Yes.

2                THE COURT:  Do you understand that if you represent

3     yourself at trial and are convicted, you will not be able to

4     argue that you made an error and that you should have done

5     things differently, the decisions you make at trial will be

6     your decisions, you'll own them, and you will be bound by your

7     decisions even if they put you in jail for a period of time?

8                Do you understand that?

9                THE DEFENDANT:  Yes.

10                THE COURT:  Has anyone threatened you or anyone else

11    in order to convince you to proceed to trial without a lawyer

12    to represent you?

13                THE DEFENDANT:  No.

14                THE COURT:  Has anyone promised you any benefit if you

15    proceed to trial without an attorney?

16                THE DEFENDANT:  Nope.

17                THE COURT:  I want you to know that if you gave up

18    your right to be represented by an attorney, and I permitted

19    that, in my judgment, you would be making an exceptionally

20    unwise decision.

21                THE DEFENDANT:  I even had friends who told me that.

22                THE COURT:  Well, be that as it may, I'm a neutral

23    here, but with a lot of experience in this system, and I'm

24    sitting here telling you and asking you to make sure -- I want

25    to make sure you understand that, in my judgment, for you to

L46KCELC

1    represent yourself here would be profoundly unwise.

2               THE DEFENDANT:  And I'm -- my response -- what I was

3    trying to convey is that I spoke to even my friends, and they

4    even believe that's a dumb move.  I just wanted to convey that.

5               THE COURT:  Okay.

6               THE DEFENDANT:  So it's not a decision --

7               THE COURT:  I'm glad your friends agree with me, but

8    do you understand that it is my view, with the --

9               THE DEFENDANT:  Yes.

10              THE COURT:  -- experience that I have, the perspective

11   I have, and the knowledge I have about this case, that it is a

12   profoundly unwise decision for you in this case to represent

13   yourself?

14              THE DEFENDANT:  Yes.

15              THE COURT:  Okay.

16         Do you understand that, in my view, you would be far

17   better off if you were represented by an experienced criminal

18   defense attorney?

19              THE DEFENDANT:  Yes.

20              THE COURT:  And I'll put it very bluntly.  This is a

21   triable case, and by a triable cases, it means that somebody

22   looking at it from the outside can imagine multiple outcomes

23   coming from this.  This is a case that could be won or lost.

24   Do you understand that, in my judgment, if you choose to

25   represent yourself, you are materially increasing the chances

L46KCELC

1    that you will be convicted of a federal felony with all that

2    that involves?

3            That is my opinion.  Do you understand that that is my

4    judgment?

5            THE DEFENDANT:  Yes.

6            THE COURT:  I want to elaborate a little bit on that,

7    because, in my view, Mr. Celli, there are particular features

8    of this case that make it unusually important for you to be

9    represented by an attorney and make it especially, in my view,

10   unwise for you to represent yourself, and I've taken some time

11   today to write these out to share them with you.  And I'm doing

12   it because I'm concerned that you would be making a very bad

13   and a very self-destructive decision if you decide to represent

14   yourself, and I hope you'll listen to me because I'm going

15   beyond the usual script here and offering some thoughts about

16   this particular case because I want you to make an informed

17   decision.  This may be the most important decision you make in

18   your life.  Okay?

19           THE DEFENDANT:  Uh-huh.

20           THE COURT:  It may not feel that way now, but if

21   you're convicted, and you're sentenced to a material term of

22   federal custody, you may be sitting there thinking what was I

23   thinking, I should have listened to that guy.  So I'm asking

24   you to listen to that guy right now.  Here goes.

25           THE DEFENDANT:  Yes.

L46KCELC

1    THE COURT:  And I'm going to focus on just one by one

2    on three different aspects of the case, in particular, where,

3    in my judgment, the lawyer could really make a positive

4    difference for you relative to self-representation.  This is by

5    no means a complete list.  It captures only some of the areas

6    in which, in my judgment, a lawyer would help, and

7    self-representation could be fatally self-destructive.

8    First, in a case involving alleged threats, the

9    defendant's state of mind and intent, what's going on up here,

10   is an unusually important issue.  You heard me earlier review

11   the elements of Section 875(c).  A skilled trial lawyer can

12   help influence how a jury assesses the defendant's state of

13   mind and intent.  A lawyer can do so through examination of

14   witnesses, including cross-examination of witnesses whom the

15   government has called.  A lawyer can also do so by offering

16   exhibits into evidence that bear on the defendant's state of

17   mind and intent.  A lawyer seeking to persuade the jury as to

18   his client's state of mind and intent can also make evidentiary

19   arguments why certain exhibits can be considered only for

20   certain limited purposes.  Such a lawyer can ask the Court to

21   give the jury limiting instructions, which the lawyer will,

22   word for word, propose.  A lawyer can also make arguments as to

23   why the evidence does not establish beyond a reasonable doubt

24   the required intent.

25   These are all challenging high-end aspects of a

L46KCELC

1    lawyer's work.  They require training, experience, and

2    subtlety, and care, and a command, a deep command, of the rules

3    of evidence.  They require an innate sense of what will fly

4    with a jury and what will not.

5           Do you understand that a person without legal training

6    and trial experience may do a far less job admitting evidence

7    with respect to intent and persuading the jury with respect to

8    the issue of intent?

9           Do you understand that?

10          THE DEFENDANT:  Yes.

11          THE COURT:  That's category one.

12          Category two:  There are two civil lawsuits in which

13   you participated may play an important role in this case.  I

14   have asked counsel to negotiate in the hope of reaching

15   agreement as to the scope of the information about those

16   lawsuits that will be put before the jury within the boundaries

17   that I gave earlier.  You heard my ruling earlier on that.

18          It may be that the parties agree, and it may be that I

19   need to resolve disputes about that.  Regardless, I expect

20   there will be, as government counsel said, witness testimony

21   about those lawsuits.  There is considerable, grave risk to you

22   about how those lawsuits are presented to the jury.

23   Questioning of witnesses may open the door to aspects of those

24   lawsuits that are profoundly unhelpful to you before the jury.

25   I have only limited exposure to the lawsuits, read only what

L46KCELC

1    I've learned in the papers in this case and a little bit about

2    what my law clerk was able to find today on the public docket,

3    so that I had some understanding of what the publicly filed

4    papers said, but just for one example, I understand there were

5    allegations in the lawsuit before Judge Brodie that you sent

6    disparaging communications over email.  A jury hearing about

7    that might regard the emails you sent in this case in a

8    considerably more unfavorable light.  A skilled lawyer will be

9    much more likely than a nonlawyer to carefully handle witness

10   questions and arguments before the Court in these areas, so as

11   not to open the door to potentially unhelpful facts.

12        Do you understand that a person such as you, without

13   legal training, may do a vastly less good job presenting

14   evidence about the prior lawsuit and making sure that you are

15   not needlessly harmed by the evidence that is received about

16   those lawsuits?

17        Do you understand that?

18        THE DEFENDANT:  Yes, but I also understand that there

19   are certain facts that are hidden.

20        THE COURT:  Be that as it may, the rules of evidence,

21   not your perception of what's being hidden, will govern what is

22   admissible.  But if you were to, say, representing yourself,

23   make some accusation to a witness, you can open the door to a

24   dump truck of bad evidence from those trials coming in about

25   you that otherwise might not just because you felt that

L46KCELC

1    something was being hidden, and in that respect, your desire to

2    express yourself and say something about something being hidden

3    might feel good in the moment, but it will feel pretty terrible

4    when ten minutes of bad stuff comes rolling in because you

5    opened the door, and it will feel really, really bad if you

6    wind up in the MCC afterwards.

7              The point here is that this is exactly --

8              THE DEFENDANT:  Oh --

9              THE COURT:  One moment.

10             This is exactly why you want a lawyer managing the

11   process of witnesses, so as not to open up those doors.

12             THE DEFENDANT:  So what happened with Judge Brodie is

13   that I filed too many -- wait --

14             THE COURT:  No, no, no, no, no, no.  This is exactly

15   why you shouldn't be representing yourself.  This is not about

16   what happened before Judge Brodie, and we're not going to be

17   litigating whether she was right, the other side was right, you

18   were right.  That's not going to be part of this trial.  This

19   trial is going to be about whether or not the elements of

20   Section 875(c) are established or not beyond a reasonable doubt

21   based on the emails that you allegedly sent on November 12th,

22   2018.  And it's precisely poking at the trials involving --

23   before Judge Brodie and Cogan that creates a risk that evidence

24   that I have held is not properly before the jury could come out

25   and in a light that would be profoundly unfavorable to you.

L46KCELC

```
1          My point is:  Do you understand that a party

2     representing himself is creating a huge risk that negative,

3     harmful, prejudicial information from those lawsuits could come

4     out in a way that hurts you?

5          THE DEFENDANT:  I guess.

6          THE COURT:  You don't believe me, do you?

7          THE DEFENDANT:  No, because my specific intent is to

8     get justice for what was deprived from me with those --

9          THE COURT:  If you are going to get justice for those

10    lawsuits, you're going to have to go somewhere else because

11    you've been charged here as a criminal defendant, and the issue

12    is whether or not you committed the crimes.

13         THE DEFENDANT:  Yes.

14         THE COURT:  You will get justice in terms of getting a

15    procedurally fair and evidentiarily based verdict as to the

16    criminal charge against you, but whatever happened civilly is

17    not going to be litigated here, but your handling of the

18    evidence through questioning of witnesses about that could also

19    result in badly harming your chances of prevailing in this

20    case.  That's all I want to make sure you understand.

21         THE DEFENDANT:  Sure.

22         THE COURT:  Is that a yes?

23         THE DEFENDANT:  Huh?

24         THE COURT:  Is that yes, you understand?

25         THE DEFENDANT:  Yes.
```

L46KCELC

1          THE COURT:  All right.

2          Third:  The jury will likely be watching you,

3     Mr. Celli, during this trial.  Juries tend to have an eye on

4     the defendant.  The way you behave and carry yourself in the

5     presence of the jury may influence, even subliminally, the way

6     jurors view you, including whether they see you as a person

7     capable of making true threats.  So, to the extent that you

8     might display a quick temper, to the extent that you might

9     display a degree of volatility, to the extent you might display

10    a degree of agitation, to the extent you might display an

11    inability to maintain control of your emotions, or words, or to

12    be on focus, all of that could play very much to your

13    disadvantage.

14          I will be very, very direct with you.  Thinking back

15    even to the initial conference we had in this case, which was

16    by telephone, you displayed some of those characteristics.  The

17    lawyer represents you at trial.  You will not have any occasion

18    to say any words before the jury unless you choose to testify.

19    You will have the significant advantage of not giving anything

20    away.  You can be a placid, stone-faced participant.

21          If, however, you represent yourself, you will be in

22    the position of being on stage and speaking frequently.  You

23    will be questioning witnesses, presumably, you'll be making

24    objections, if you can formulate one consistent with the rules

25    of evidence to questions by the other side, you'll be making

L46KCELC

1   objections to evidence offered by the other side, you would

2   have the right to make jury addresses.  If you failed to abide

3   by an evidentiary ruling of the Court, the Court may be

4   required to direct you, in increasingly firm language, to abide

5   by, to obey, the Court's ruling.  If you do not do that in the

6   presence of the jury, they may draw a negative conclusion about

7   your desire to comply with the law because if you can't comply

8   with the rules in the courtroom, the premise might be, why

9   should we assume that he was complying with the law in the

10  offense that's been charged.  It is possible, if you were

11  representing yourself, you would be triggered to say something

12  in anger or to make an intemperate accusation in the heat of

13  the moment in trial.  So it is possible — and I'm being very

14  direct with you — that your temperament and the way you carry

15  yourself while carrying out those speaking functions could harm

16  you badly in the jury's eyes.

17         Do you understand that if your case is in the hands of

18  an attorney at trial, there will be far less opportunities for

19  moments like that to occur in which something you say or do

20  could lead the jury to draw an unhelpful negative inference

21  about you?

22         THE DEFENDANT:  Yes.

23         THE COURT:  All right.

24         Counsel, it is -- Mr. Celli, look, I'm trying to be

25  responsible, and share with you, and unpack for you the real

L46KCELC

1   risks I see here.  Would you like to discuss this issue further

2   with Mr. Silverman?

3          THE DEFENDANT:  What I would like to discuss is what

4   has occurred to me since day one in this courtroom, not your

5   courtroom.

6          THE COURT:  You've never been in this courtroom.  Day

7   one, that is today.  You've never been here until two hours

8   ago.

9          THE DEFENDANT:  No, no.  What I mean is this whole

10   trial process.

11          THE COURT:  Sorry, Mr. Celli, I'm focusing on the

12   issue at hand here.  This is not going to be an opportunity to

13   have grievances about other things that happened earlier in the

14   prosecution, any more than the trial would be an opportunity

15   for you to have grievances about the counterparties, the

16   opposing parties, in the civil cases.  That's not what this is

17   going to be about.

18          So, you need to answer my question.  Do you want to

19   discuss this extremely important issue in your life further

20   with Mr. Silverman?

21          THE DEFENDANT:  Yeah, okay.  But, like, you're telling

22   me my intent.  Like I know what I intended.

23          THE COURT:  I don't know what you intended.  The

24   evidence --

25          THE DEFENDANT:  I intended -- the UFT denied me a

L46KCELC

1    grievance, and I shitted in my pants.  Okay?

2              THE COURT:  You what?

3              THE DEFENDANT:  I shitted in my pants because the UFT

4    denied me a fair grievance.  A principal put her hand in my

5    face.  Randi threatened to expose my rape.  Betsy, through

6    Randi, said that if I continued, that she would find a way to

7    be vindictive.  My HIV status has been put on the internet more

8    than once.

9              THE COURT:  Okay, Mr. Celli.

10             THE DEFENDANT:  And -- wait, wait -- Betsy has

11   harassed me for five years, and it's the Court's fault is why

12   we're here, because it is a crime, and I wrote this in my

13   thing, and I sent it to the senators, everybody that's

14   involved, the common denominator is Senator Schumer and Randi

15   Weingarten.

16             THE COURT:  Mr. Celli, what you have just said is

17   Exhibit A why you should not be representing yourself at trial,

18   because virtually nothing you've just said in the last 60 or 90

19   seconds would be admissible for any purpose in this trial or be

20   properly said before the jury.  Were you to do that, you would

21   be immediately reprimanded for speaking about subjects that

22   have nothing to do with the case --

23             THE DEFENDANT:  That's my intent.

24             THE COURT:  -- that are not admissible, and if you

25   tried to question a witness about those areas, I expect,

L46KCELC

1    depending on the question, the objection would likely be

2    sustained, and, more to the point, if you tried to poke around

3    in those areas, because they really have nothing to do with

4    whether you made a threat or not, and with the requisite

5    intent, there is a real possibility that the door would open to

6    other information about those lawsuits.

7              Do you understand --

8              THE DEFENDANT:  So February 5th, 2019, Ms. Betsy said

9    everything that was done prior in those lawsuits was okay, and

10   then I had other people from the DOJ said that what was done to

11   me is a crime, so -- and that goes back to the 800 section.

12             THE COURT:  All right.  Look, I appreciate that.

13             THE DEFENDANT:  That's why I wrote --

14             THE COURT:  I fully appreciate the sincerity of the

15   feelings you have about the people you've mentioned and those

16   past events in your life, but I also need to tell you that the

17   focus of this trial will be tightly focused on the conduct

18   alleged and the acts of your state of mind in connection with

19   it.  I think it would be productive for you to spend a little

20   more time with Mr. Silverman, and I really have tried to bend

21   over backwards to explain why I'm worried that if you

22   represented yourself, you would be harming yourself potentially

23   in an unforgettable bad way.  It could be the worst decision of

24   your life, and I'm really being very blunt with you.

25             This is what I would like to do.  I'm going to confer

L46KCELC

1   with Mr. Smallman, but what I'd like to do is have you and

2   Mr. Silverman speak.  And I will tell you that Mr. Silverman's

3   advocacy in this case has been absolutely first rate.  He is a

4   counselor who has my esteem, and he has my respect for the

5   quality and rigor of his advocacy.  He has exactly the skill

6   set that you need to formulate your position as best as

7   possible within the language of the courtroom.  I would like --

8           THE DEFENDANT:  I agree with that.

9           THE COURT:  Good, I'm glad.

10          And, Mr. Silverman, you have my thanks for taking on

11  the representation, as I've said before.

12          MR. SILVERMAN:  Thank you, your Honor.

13          THE COURT:  But I'm going to speak with Mr. Smallman

14  about a time when we can meet.  What I have in mind is an

15  ex parte conversation because I want to make sure that I

16  understand the nature of the relationship between you two, and

17  I want to -- Mr. Silverman, because -- Mr. Celli, because I

18  respect the fact that you appear to have misgivings about

19  advice Mr. Silverman has given you, and it may be worth my

20  exploring those with you because my assessment of those issues

21  may be informative here.

22          Mr. Smallman, let's identify a date.

23          (Pause)

24          THE COURT:  Counsel, Mr. Smallman helpfully reminds me

25  that on April 16th, a week from Friday, we already have a

L46KCELC

1    conference at 2:00 p.m.  May I suggest that I meet with

2    Mr. Celli and Mr. Silverman at 1:00 p.m.?  That way, I'm not

3    assuming you've got the contiguous time frame.

4         Government, I'll ask you to be available, as well, at

5    2:00.  I don't know how long the conversation with me and the

6    defense may take, so bring reading material, but, that way, at

7    least I'm not adding a conference to everybody's day.

8         And can I just ask — this has worked very well —

9    Mr. Silverman, do I have your consent to do this conference

10   again in this courtroom?

11        MR. SILVERMAN:  Yes, your Honor.  And I would just

12   note I have a sentencing at 10:30 in the Eastern District that

13   morning, but I should be able to be here by 1:00 p.m.

14        THE COURT:  Very good.

15        Mr. Smallman tells me, for independent reasons, it may

16   be easier for my chambers to do this on Thursday, the 15th, in

17   the afternoon, and that may also get rid of any potential pinch

18   with Mr. Silverman's schedule.  Are counsel free that day?

19        MS. KARMIGIOS:  Yes, your Honor.

20        MR. SILVERMAN:  Yes, your Honor.

21        THE COURT:  May I suggest, then, that -- Mr. Smallman,

22   can we say 2:00 p.m. on Thursday?

23        How about 2:00 p.m. on Thursday, April 15?

24        MR. SILVERMAN:  Yes, your Honor.  Is that for just --

25        THE COURT:  That's just for you two.  We'll keep the

L46KCELC

1    conference on for the following day.

2         MS. KARMIGIOS:  Okay.

3         THE COURT:  That way, I can take all the time I need

4    with Mr. Silverman and Mr. Celli, without feeling my time is

5    cramped.  So we'll keep the conference on for Friday with all

6    concerned, but I will use Thursday for that purpose.

7         Mr. Silverman, I think even if you and Mr. Celli --

8    even if Mr. Celli reaches what I think is the wise judgment

9    here, which is to keep you on as his trial counsel, even if you

10   get to that point, I still want to meet with you, because I

11   think I may be of service here, and I think it's a useful

12   conversation, and I also want to create a clear record that I

13   have followed up with these questions just to make sure there

14   are no loose ends.

15        MR. SILVERMAN:  Thank you, your Honor.

16        THE COURT:  So, regardless of the state of play, while

17   I'm happy to receive a letter from you, if you find it useful,

18   alerting me to the state of play before we gather, I still want

19   to meet you Thursday of next week at 2:00 p.m.  So, in effect,

20   we're adding a Thursday conference and keeping the Friday one

21   intact.  The Friday is for everybody; the Thursday is just for

22   the Court and the defense.  Given the nature of the conference,

23   it will be an ex parte conference.  There will be a court

24   reporter, of course, but the transcript will be maintained

25   under seal.

L46KCELC

1              Mr. Silverman, I take it this is a sensible approach?

2              MR. SILVERMAN:  Yes.  And we appreciate your Honor's

3    time.

4              THE COURT:  Okay.  Government, you are -- again, you

5    are fine with that?

6              MS. KARMIGIOS:  Yes, your Honor.

7              THE COURT:  And I think I've secured this, but,

8    government, you consent to doing this here in this courtroom?

9              MS. KARMIGIOS:  Yes, your Honor.

10             THE COURT:  And defense?

11             MR. SILVERMAN:  Yes, your Honor.

12             THE COURT:  All right.  I'm going to break in a

13   moment, but before we do, look, we are still very much on for

14   trial on the 17th, nothing about the schedule has changed.

15   We'll use the meeting on Friday, the 16th, to take stock of the

16   trial, which, at that point, will be a month and a day away.

17             Is there anything, though, at this point that I can be

18   helpful on in clarifying for counsel?  Anything that I can be

19   of use on?

20             MR. SILVERMAN:  Oh --

21             THE COURT:  Sorry, counsel.

22             THE DEFENDANT:  Sorry.

23             MR. SILVERMAN:  Your Honor, may I confer with my

24   client?

25             THE COURT:  Yes.  I was about to ask the government

L46KCELC

1    first, though.

2              MS. KARMIGIOS:  Not at this time, your Honor.  Thank

3    you.

4              THE COURT:  Okay.  Go ahead, Mr. Silverman.

5              (Defendant and counsel conferred)

6              MR. SILVERMAN:  Your Honor, Mr. Celli would like me to

7    bring to the Court's attention that he submitted a letter that

8    I saw early this afternoon to the Attorney General, Gerald

9    Garland, concerning allegations of judicial misconduct.

10             THE DEFENDANT:  No, it's -- no, it's the conduct of

11   the AUSA and the fact that they need waivers -- well, I know

12   Ms. Benson didn't have a waiver, and she lied about her --

13             THE COURT:  Sorry, I didn't hear.  The conduct of who?

14             MR. SILVERMAN:  Mr. Celli said the conduct of the

15   AUSAs, so he has --

16             THE DEFENDANT:  That's why I wrote to the senate

17   judiciary, because they handle those complaints, and the U.S.

18   Marshals, and I sent it -- I have motions that I wanted to

19   bring up, and I sent them my intent, my subjective intent,

20   which I just told you.

21             THE COURT:  It's news to me that you have filed those

22   submissions.

23             THE DEFENDANT:  No, no, I didn't file them.  He has

24   them.  I gave them to the senate and ethics committee because

25   of what I believe is happening.

L46KCELC

1          THE COURT:  All right.  Look, Mr. Celli, you are at

2     liberty to make those submissions.  If somebody wants to bring

3     a claim to my attention that bears on anything relevant to this

4     case, you're at liberty to do so, bounded by the Rules of

5     Professional Responsibility and truth-telling.  And if

6     something crosses my plate, I will act appropriately on it.

7          At this point, I'm understanding, Mr. Silverman, that

8     nothing has been filed in this case?

9          MR. SILVERMAN:  That's my understanding.  I learned of

10    this just before today's conference, but I am not entirely --

11         THE COURT:  Mr. Celli, you're not helping yourself

12    necessarily by raising extraneous matters.

13         THE DEFENDANT:  No, no, I want to file a judicial

14    complaint against Ms. Scanlon -- excuse me, Magistrate Scanlon.

15         THE COURT:  Magistrate who?

16         THE DEFENDANT:  Magistrate Scanlon.

17         MR. SILVERMAN:  If I may, I believe Mr. Celli has

18    respectfully requested a modification to his bail to allow him

19    to contact the Second Circuit, so that he can file a complaint

20    for judicial misconduct against Magistrate Judge Scanlon who

21    arraigned him in the Eastern District of New York.

22         THE COURT:  I have no context with which to view that

23    application.  I just don't know what has been -- I don't know

24    what his bail conditions are that are inconsistent with that.

25    I'm happy to receive a written application and get a proper

L46KCELC

1    response from the other side.

2            All right.  With that, then, we stand adjourned.  I

3    look forward to seeing the defense in a week.  Thank you.

4            MR. SILVERMAN:  Thank you, your Honor.

5                              * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25