L4QACELCps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,
                                        EDNY Docket:
4              v.                       19-cr-127 (PAE-VJ)

5   LUCIO CELLI,

6              Defendant.               Conference

7   ------------------------------x

8                                       New York, N.Y.
                                        April 26, 2021
9                                       2:15 p.m.

10

    Before:
11
                    HON. PAUL A. ENGELMAYER
12
                                        District Judge
13

14                      APPEARANCES

15  AUDREY STRAUSS
         United States Attorney for the
16       Southern District of New York
    BY:  ANNA KARAMIGIOS
17       JENNIFER SASSO
         Assistant United States Attorneys
18
    BENJAMIN SILVERMAN
19       Attorney for Defendant

20

21

22

23

24

25

L4QACELCps

1          (Case called)

2          THE CLERK:  Counselors, state your appearance for the

3   record, please.

4          MS. KARAMIGIOS:  Anna Karamigios and Anna Sasso for

5   the government.  Good afternoon, your Honor.

6          THE COURT:  All right.  Good afternoon,

7   Ms. Karamigios.  Ms. Sasso.

8          MS. SASSO:  Good afternoon.

9          MR. SILVERMAN:  Good afternoon, your Honor.  Benjamin

10  Silverman for Lucio Celli, seated to my left.

11         THE COURT:  Good afternoon, Mr. Sasso.  Good

12  afternoon, Mr. Celli.

13         And thanks as always to our court reporter.

14         Let me begin just by determining, as I have for the

15  last few conferences, that counsel for each side consent to our

16  holding this proceeding in the Southern District

17  notwithstanding that the case is housed in the Eastern

18  District.  Government?

19         MS. KARAMIGIOS:  Yes, your Honor.

20         MR. SILVERMAN:  Yes.

21         THE COURT:  Very good.  OK.

22         There are a handful of items I need to take up with

23  you today and I'll just take them up in the following order,

24  beginning with this:  I received a letter from you, Mr. Sasso,

25  on April 19, which reads, "Your Honor, I write respectfully to

L4QACELCps

1    inform the Court that Mr. Celli would like to withdraw his

2    request to proceed pro se.  We thank the Court for its time and

3    its consideration of this matter."

4         Mr. Sasso, thank you for promptly notifying me of

5    that, which was an assistance.  I just need to confirm with

6    Mr. Celli that that is in fact his decision.

7         Mr. Celli, I just want to make sure, I received that

8    from your lawyer, but that is in fact your request, to withdraw

9    your application and proceed pro se.

10        THE DEFENDANT:  At the present time, yes.

11        THE COURT:  OK.  Very good.

12        All right.  So you've thought about it.  You've spoken

13   about it with Mr. Sasso.  And you are at this point not seeking

14   to proceed pro se.  Correct?

15        THE DEFENDANT:  At the present time, yes.

16        THE COURT:  That's the only time at which I'm asking.

17        THE DEFENDANT:  OK.

18        THE COURT:  So the answer is, yes, you are withdrawing

19   the motion.

20        THE DEFENDANT:  Yes.  I'm sorry.  Yes.

21        THE COURT:  OK.  Very good.

22        OK.  Thank you.  And I certainly will take the motion

23   as having been withdrawn.

24        Notwithstanding that, having spent, you know, a

25   substantial amount of time with counsel and Mr. Celli and

L4QACELCps

1    inquiring of him, as of when I received word from Mr. Silverman

2    that Mr. Celli was withdrawing that motion, I had reached a

3    determination how to rule on the motion, and had very

4    substantially completed my legal analysis of that point, and I

5    think it is worth putting on the record how the Court would

6    have resolved that motion and why, both in the interest of a

7    complete record and in the not inconceivable event that similar

8    issues will arise.

9         Here goes.  So I'm going to read aloud a short bench

10   decision.  And I'm going to have Mr. Smallman hand a copy to

11   the court reporter.

12        Last month, defendant Luccio Celli made a motion to

13   waive his Sixth Amendment right to counsel and to represent

14   himself in his upcoming trial.  That is at docket 124.  That

15   motion was the subject of several in-person hearings, after

16   which, on April 19, 2021, Celli withdrew his motion.  That is

17   at docket 144.  The Court has just now confirmed with Mr. Celli

18   on the record today that his intention to withdraw the motion

19   was knowing and intelligent and the product of consideration.

20   Before being notified of Celli's decision to withdraw the

21   motion, the Court had determined that the motion was properly

22   denied.  In the interest of a complete record, the Court will

23   now put on the record, in abbreviated form to be sure, but

24   sufficient to explain my reasons, the bases on which the Court

25   would have denied Celli's motion to represent himself.  As with

L4QACELCps

1    the recent decision resolving motions in limine, I will not be

2    issuing a written order.  So, if the content of what I say is

3    important to you, you will need to order the transcript of this

4    conference.

5          First of all, some background.  On March 29, 2021,

6    Benjamin Sasso, Esq., counsel for Celli, filed a letter stating

7    that Celli wanted to represent himself at his upcoming trial.

8    That is, again, at docket 124.  Provided that he is competent,

9    a criminal defendant has a Sixth Amendment right to forgo

10   counsel and represent himself, citing *Faretta v. California*,

11   422 U.S. 806, 819-20 (1975).  As the Second Circuit has put the

12   point: "A criminal defendant is entitled to proceed pro se if

13   he knowingly, voluntarily, and unequivocally waives his right

14   to appointed counsel."  *Wilson v. Walker*, 204 F.3d 33, 37 (2d

15   Cir. 2000).

16         On April 6, 2021, consistent with *Faretta*, the Court

17   conducted a hearing to allocute Celli under oath as to the

18   risks of self-representation and to enable the Court to

19   determine whether Celli's decision to proceed pro se was in

20   fact knowing, voluntary, and unequivocal.  As the transcript

21   reflects, the Court questioned Celli at length about relevant

22   matters.  And I'll be citing to the transcript, which is

23   docketed now at docket 145.

24         One area of questions involved Celli's experience with

25   self-representation.  Celli has represented himself in

L4QACELCps

connection with two prior lawsuits.  Those were discussed at
pages 70 to 76 of the transcript.  He acknowledged that he did
not prevail in either case.  He also acknowledged that his pro
se lawyering activities in those cases were limited to filing
documents.  He did not have occasion in either case to make an
oral presentation in court.  Neither case, nor either of his
prior criminal cases, entailed in-court events, such as
evidentiary hearings, the questioning of witnesses, or trial.
Citing the transcript at pages 71 and 76 to 78.  Celli stated
that he has obtained annotated copies of the Federal Rules of
Evidence and the Federal Rules of, it appears, Criminal
Procedure.  But, he stated, he has not read them in full or
studied them or obtained instruction as to them.  Citing the
pages at 68 and 72.  The Court engaged in a colloquy with Celli
as to the extent of his understanding of these rules.  That's
at pages 79 to 81.  The Court also probed Celli as to other
aspects of his legal experience and knowledge.  Celli stated
that he has never served as a juror, observed jury selection,
or attended a criminal trial.  Page 78.  Nor, he stated, has he
ever testified at a proceeding.  He acknowledged that he does
not know how to call witnesses, or evidence, or subpoena
witnesses to testify.  That is at page 89.

          The Court also allocuted Celli as to the role of the
judge at a trial, the benefits of having experienced counsel
handling his representation, and including the benefits that

L4QACELCps

1    would be brought to Celli's defense, and the challenges that

2    Celli would face as a defendant in a criminal trial.  Pages 81

3    to 84.  The Court confirmed that Celli was aware of the

4    consequences of conviction, including facing a prison sentence

5    and fine and special assessment, and supervised release time

6    that he would face.

7               Celli stated that he understood that, if he elected to

8    represent himself, in order to present his version of events to

9    the jury in his own words, he would still have to take the

10   stand and testify and expose himself to cross-examination.

11   Celli further stated that he understood various risks of

12   self-representation.  These included that jurors might draw

13   adverse inferences or adverse conclusions about him based on

14   his conduct as counsel, that his questioning of witnesses might

15   inadvertently elicit information that might hurt his defense,

16   and that the jury might infer from his questions that he

17   possesses certain information.  The Court further explained,

18   and Celli indicated that he understood, that, unlike in the

19   situation where a defendant is counseled at trial, if he were

20   convicted after proceeding pro se, he would not be able to

21   appeal his conviction on the basis of ineffective assistance of

22   counsel.  And that whole discussion was covered at pages 90 to

23   95.

24               Finally, the Court reviewed three aspects of Celli's

25   case that, in the Court's assessment, made it especially

L4QACELCps

1    advisable for Celli to be represented by seasoned counsel.

2    First, the Court noted, insofar as Celli's intent and state of

3    mind in connection with the communications at issue are central

4    elements in this case of alleged threatening communications in

5    violation of 18 U.S.C. § 875(c), a seasoned lawyers dexterity

6    in eliciting state-of-mind evidence and making nuanced

7    arguments about state of mind could assist the defense, whereas

8    Celli's inquiries and statements as to these prior lawsuits

9    might redound to his detriment before the jury.

10            Sorry.  One moment.

11            All right.  Let me go back a moment, if I may.

12            The first is that a seasoned lawyer's dexterity in

13   eliciting state-of-mind evidence and making nuanced arguments

14   about state of mind might assist the defense, whereas Celli's

15   handling of that might not be so deft.

16            Second, Celli's prior civil lawsuits are a central

17   issue at trial, and the Court expects, as we discussed, to put

18   strict limits on what could be elicited about those lawsuits.

19   Mr. Celli's discussions and questions about those lawsuits

20   could redound to his benefit -- to his detriment, to the extent

21   that he attempted to relitigate those matters or exhibited

22   anger or frustration with respect to those matters.

23            And third, the Court noted that aspects of Celli's

24   conduct and temper, as exhibited in pretrial conferences, could

25   harm his cause before the jury, and were Celli to have a

L4QACELCps

speaking role at trial as opposed to leaving his representation
in the hands of counsel, the jury would be more likely to be
exposed to potentially problematic behavior on his part.

        And that discussion taking those cases into
consideration was at pages 97 to 104.

        After the *Faretta* inquiry, which was conducted in open
court in the presence of government counsel, the Court
determined that it would be helpful to have an ex parte meeting
with Celli and his counsel.  The Court's objective was to
determine whether Celli's stated desire to represent himself
reflected misgivings specific to his current counsel,
Mr. Sasso, who is the fourth attorney successively to represent
Mr. Celli in this matter.  The Court's perception was that
Celli's relationship with Mr. Sasso was in fact productive and
positive and that Celli's motion to represent himself appeared
to derive from his frustration that his counsel could not,
consistent with the ethical rules, defend the case in the way
that Celli imagined, which would have entailed intensively
litigating various underlying grievances of his that largely
formed the basis of Celli's prior civil lawsuits.  Consistent
with that, Celli and Mr. Sasso, at the *Faretta* hearing,
confirmed that there had not been a breakdown in their working
relationship.

        And as I said, on April 15, the Court met with Celli
and his counsel ex parte.  The transcript of that hearing,

L4QACELCps

1    insofar as it probed the relationship between the defendant and

2    his counsel, is properly maintained ex parte.  As an overview,

3    however, the Court can properly report the following:

4         First, both Celli and Mr. Sasso reported that they

5    enjoy a productive working relationship.  There has been no

6    rupture.  Second, the impetus for Celli's application to

7    represent himself is substantially, as anticipated, his dismay

8    that counsel have advised him that certain strategies and

9    courses of inquiry that he might like to pursue at trial are

10   precluded by the ethical rules governing counsel and/or the

11   Federal Rules of Evidence.  The Court advised Celli that the

12   guidance he has received along those lines is correct and well

13   taken: that the Court in fact would not permit any counsel, or

14   Celli pro se, to pursue certain strategies at trial in light of

15   the ethical rules and the rules of evidence.  Accordingly, the

16   Court advised Celli, a substitute counsel would not be

17   permitted to litigate the case in the manner that Celli

18   envisioned and Celli would not be permitted to, either.  And

19   third, when the Court asked Celli whether he still wanted to

20   give up the significant advantages that Celli would bring to

21   his defense, Celli equivocated.  He replied, and I'm quoting

22   the transcript, "I'm hesitating for time....I'm lost for words.

23   Usually I'm not lost for words, but I'm lost for words at this

24   time."  And Celli's counsel then aptly noted that *Faretta*

25   requires a clear and unequivocal waiver, and this statement

L4QACELCps

1    from Celli appeared to supply uncertainty.

2            So that's the background to the Court's assessment.

3            In light of Mr. Celli's statement at the ex parte

4    proceeding, the Court cannot find that Celli's request, even if

5    it had not been later explicitly withdrawn, is unequivocal.

6    And, again, under *Faretta*, a request for self-representation

7    must be unequivocal.  As authority for that proposition, I

8    would cite among other cases *United States v. Barton*, 712 F.3d

9    111, 118 (2d Cir. 2013); *United States v. Barnes*, 693 F.3d 261,

10   271 (2d Cir. 2012); *Wilson*, 204 F.3d at 37; and *Williams v.*

11   *Bartlett*, 44 F.3d 95, 100 (2d Cir. 194).

12           In any event, of course, Mr. Celli has now withdrawn

13   his request.  Mr. Sasso conveyed that in his letter of April

14   19.  Mr. Celli confirmed that today.  So we have therefore not

15   only an equivocal request, but a withdrawn one.  So that aspect

16   of the *Faretta* standard is not met.

17           Even if Mr. Celli had made an unequivocal request, the

18   Court would have denied it.  And that is because, on the

19   considerable record that has by now been developed, the Court

20   is unpersuaded that Celli, although competent to stand trial,

21   is competent to waive his right to counsel.

22           As I explained earlier, a criminal defendant has the

23   right to waive his Sixth Amendment right to counsel provided

24   the waiver is knowing, voluntary, and unequivocal.  That is

25   *Faretta*, 422 U.S. at 819.  However, as the Supreme Court held

L4QACELCps

in *Indiana v. Edwards*, 554 U.S. 164, 177-78 (2008), judges are
not required to permit a criminal defendant to represent
himself where he is not competent to do so.  Here, two
psychologists have found Celli competent to stand trial, and
that determination, in the Court's assessment, is clearly
correct.  However, as the Supreme Court has held, the standard
of competency to stand trial with the assistance of an attorney
is not necessarily the same as competency to waive the right of
counsel and proceed pro se.  Citing *Indiana v. Edwards*, 554
U.S. at 174-175.  Rather, *Indiana* permits the Court to make an
independent finding as to whether, here, Celli is competent to
represent himself.

        Pursuant to that line of authority, judges have the
discretion to insist that counsel represent the "discrete set
of defendants competent to stand trial but incompetent to
represent themselves."  Citing *United States v. Turner*, 644
F.3d 713, 724 (8th Cir. 2011).  I believe, and had Celli
pursued his application to completion for self-representation I
would have held, that Celli falls into this narrow class of
defendants.  Neither Dr. Rosenfeld nor Dr. Goldsmith diagnosed
Celli with a specific mental illness.  But Dr. Rosenfeld did
conclude that Celli exhibited signs of anxiety, PTSD, and
paranoia regarding the legal system in particular.  I'm citing
the Rosenfeld report, which is at docket 146 at pages 4 to 6.
The Court has assessed Celli's conduct before Judge Donnelly

L4QACELCps

1    and before this Court in light of these clinical observations.

2    Celli's courtroom conduct reveals, indeed consistently --

3    consistency -- excuse me -- consistently, that in all

4    likelihood as a consequence of these impairments, Celli has

5    serious endemic obstacles impeding his ability to represent

6    himself.

7              First -- I'm going to elaborate -- first, Celli has

8    repeatedly demonstrated a fixation on if not obsession with

9    civil cases, which are of limited probative value in this

10   prosecution for threats to federal judges, and a similar

11   fixation with the conduct and outcome of his 2019 bail hearing,

12   which is of no probative value in this prosecution whatsoever.

13   In that respect, this case is akin to *United States v.*

14   *Nyenekor*, 784 F. App'x 810 (2d Cir. 2019), in which the Second

15   Circuit in a summary order upheld Judge Seibel's decision to

16   deny a defendant's motion to represent himself because his

17   mental illness made him fixate on nonmeritorious legal issues

18   and disrupt courtroom proceedings.  *Id.* at 814.  The record in

19   this case amply and similarly demonstrates the persistence and

20   severity of Celli's fixation on past perceived wrongs that are

21   ultimately nonissues in this prosecution.

22             Before the transfer of the case to this Court, in fact

23   Judge Donnelly remarked on at least two occasions on Celli's

24   tendency to fixate on things that are not relevant to his case,

25   specifically civil cases.  I'm citing docket 102 at page 12 and

L4QACELCps

1    docket 75 at pages 3 to 4.  That behavior has continued during

2    this Court's supervision of this case.  Despite encouragement

3    from the Court and counsel, Celli has repeatedly displayed an

4    inability to focus on his criminal charges and an inability to

5    grasp the very limited context in which his civil cases are

6    relevant here.  For example, at various points during the April

7    6 *Faretta* inquiry, Celli became fixated on his civil cases and

8    struggled to refocus himself on the Court's questions.  Citing

9    the transcript at pages 69, 101 to 102, and 105 to 107.  Celli

10   insisted that his intent in defending himself in the criminal

11   was to seek justice for wrongs purportedly done to him in

12   connection with those civil lawsuits.  Citing *id.* at 102.

13        Finally, although Dr. Eric Goldsmith, who examined

14   Celli in March of this year, did not diagnose Celli as

15   schizophrenic or suffering from delusional disorder, in the

16   context of litigation, he concluded, consistent with the prior

17   assessment, that Celli had a tendency to become fixated and

18   confounding.  That accords, as I said, with Dr. Rosenfeld's

19   conclusion that Celli exhibited signs of anxiety, PTSD, and

20   paranoia regarding the legal system.  To be sure, Dr. Rosenfeld

21   concluded that with respect to his daily life, Celli did not

22   appear to be delusional.  But while Celli's impairment may not

23   render him incompetent to stand trial, with the assistance of

24   counsel, an impairment in the context of litigation is

25   precisely what leads this Court to conclude that Celli is not

L4QACELCps

competent to play the "significantly expanded role required for
self-representation even if he can play the lesser role of
represented defendant."  Citing the Supreme Court's decision in
*Edwards*, 554 U.S. at 176.  I honestly do not believe and cannot
conclude that, without the benefit of counsel, Celli will be
able to focus at trial on defending against the criminal
charges against him.  His track record demonstrates that,
consistent with the above diagnoses, he will instead fixate on
attempting to relitigate his civil cases and perhaps his 2019
bail hearing.  Were Celli responsible for conducting this
defense, his fixation on past civil grievances would stand to
gravely undermine his ability to organize his defense, make
motions, question witnesses, present admissible evidence,
conduct voir dire, and defend, in jury argument, the
proposition that the proof at trial does not establish his
guilt beyond a reasonable doubt.

Celli's recent pro se submission in this case
powerfully underscores this conclusion that he is mentally
fixated on largely irrelevant grievances.  Celli's March 22,
2021 pro se submission in support of a continuance begins with
a disorganized, 15-page letter, ten pages of which are
dedicated to the wrongs allegedly perpetrated against him by
the plaintiff in one of his civil cases.  *See* Dkt. 123.  The
remaining pages accuse judges, AUSAs, former attorneys for
Celli, and other unknown individuals of various crimes.  None

L4QACELCps

1    of these allegations are relevant in the slightest to whether a

2    continuance of the trial date is appropriate.

3            That concludes the Court's discussion of the first

4    consideration supporting the finding under *Indiana v. Edwards*

5    that Celli is not competent to represent himself.

6            Second, Celli has periodically demonstrated inability

7    behaving himself in conferences and hearings.  That has been a

8    persistent problem in this case.  Judge Donnelly remarked at

9    various points upon Celli's tendency to react poorly and become

10   upset when his lawyers were unwilling or unable to take certain

11   acts on his behalf and that he has yelled and screamed during

12   conferences.  *See* Dkt. 75 at 3-4; Dkt. 76 at 5.  This Court has

13   observed similar outbursts.  Although Dr. Goldsmith concluded

14   that Celli understands that courtroom misconduct may lead to

15   the revocation of his ability to proceed pro se, Dr. Rosenfeld

16   suggested that he had doubts about Celli's ability to comport

17   himself in the courtroom consistent with that precept.  Citing

18   Rosenfeld report at page 5.  Dr. Rosenfeld suggested that

19   chile's physicians have proven able to help him regain control

20   of his emotions.  *See id.* at 6.  But his physicians would not

21   be alongside him at the podium when he questioned witnesses,

22   made arguments to the Court, or addressed the jury.  And

23   despite being counseled during the pretrial phases of this case

24   by a series of very capable lawyers, Celli's outbursts have

25   continued.  This Court has had to admonish Celli on multiple

L4QACELCps

 1    occasions to temper his anger and focus his remarks on relevant

 2    subject matter.  This behavior further underscores the

 3    importance of counsel, not Celli, being responsible for Celli's

 4    defense.  To be sure, Celli's present counsel appears to have

 5    had a salubrious effect on Celli.  It is clear that Celli

 6    respects his current counsel's strategic insights and conduct

 7    of the defense.  But I am not confident that Celli would be

 8    able to regain control of his remotions at trial if left to his

 9    own devices.  The risk that outbursts, irrelevant tirades, or

10    other misconduct -- on a level that could prejudice Celli

11    before the jury or even lead to his removal from the

12    courtroom -- is, in this Court's judgment, palpably higher were

13    Celli to proceed pro se.

14            So, for these reasons, had Celli not abandoned his

15    application to proceed pro se, I would have found Celli not

16    competent to waive his Sixth Amendment right to counsel.  I

17    would have found Celli's mental impairments to be severe enough

18    to place him in that "discrete set" of defendants who, although

19    competent to stand trial, are not competent to elect to

20    represent themselves.

21            And therein ends the ruling.

22            All right.  That's the first order of business I have

23    for you today.  The second involves an evidentiary issue.  I

24    had asked counsel to come together to discuss the specific

25    parameters with respect to the introduction of evidence

L4QACELCps

 1    vis-a-vis the civil case, and I have had a motion in limine

 2    that at a macro level ruled on this point but left some of the

 3    short stokes to counsel.  Let me ask you, Ms. Karamigios, is

 4    that something that counsel made progress with?

 5              MS. KARAMIGIOS:  Your Honor, with apologies, given

 6    what's going on, we have not been able to discuss that yet, but

 7    we will endeavor to do so as soon as is possible.

 8              THE COURT:  Mr. Silverman, is that correct?

 9              MR. SILVERMAN:  That's correct.  It's my anticipation

10    that we will confer over the next week and submit letters to

11    the Court on May 3rd.  But we have not nailed down the

12    parameters yet.

13              THE COURT:  OK.  Look, I mean, again, I welcome your

14    nailing down that which you can and specifying the areas where

15    you can't so that at least I can offer you a ruling.  I've

16    given you directional guidance, but it seemed better to put in

17    counsel's hands in the first instance the ability to agree or

18    disagree and to identify areas of disagreement.  So please do

19    get me something, because I am eager to give you guidance.  I

20    want you to be able to open and guide your witnesses, mindful

21    of the ground rules, and I want to be in a position where I can

22    set ground rules for you beforehand, so that you can plan for

23    trial.  My goal is for counsel never to have surprises at

24    trial, at least from the Court.  So the more guidance I can

25    give you, it's better for everyone.

L4QACELCps

1          All right.  The next issue which I regret to take up

2    is as follows:  Earlier today, I received a memorandum from the

3    Pretrial Services agency, specifically from Pretrial Services

4    Officer Ramel Moore, dated today, which recounted an incident

5    in which, as reported in the memorandum, Mr. Celli violated his

6    conditions of release.  Specifically, the memorandum reports

7    that on April 23rd, Mr. Celli contacted AUSA Karamigios to

8    obtain her fax number.  And the details of the exchange are set

9    out in the memo, and we will file the memo -- we'll arrange for

10   its filing under seal.  But the thrust of it is that the caller

11   called from a particular fax number on the afternoon of April

12   23rd.  The caller identified himself as John Smith.  The caller

13   requested her fax number.  AUSA Karamigios declined to provide

14   the fax number and disconnected the call.  She identified the

15   caller as the defendant based on her previous conversations

16   with him.  And according to the memorandum, the pretrial

17   officer of the Southern District who is responsible for

18   Mr. Celli's supervision, Leo Barrios, confirmed that the fax

19   number -- the phone number, rather -- that AUSA Karamigios

20   recorded as associated with the caller belonged to the

21   defendant's mother, Fernanda Celli, who serves as the

22   defendant's third-party custodian.

23          I spoke briefly shortly before the conference to both

24   Pretrial Services officers, both Officer Moore and Officer

25   Barrios.  Officer Moore has not had contact with Celli about

L4QACELCps

1    this incident.  Officer Barrios has recounted essentially the

2    events similar to the way that the memorandum does, but stated

3    that, in the context of his conversation with Mr. Celli,

4    Mr. Celli both did not deny what had happened and said, or said

5    in substance, that he had done it, i.e., that he had been the

6    person to have had the call in question with AUSA Karamigios.

7              I note that the Pretrial Services office is

8    recommending that Mr. Celli's bond be revoked, quote, in that

9    his continued noncompliance while under pretrial

10   supervision" -- the memorandum reads, in relevant part, "This

11   is the ninth violation memorandum Pretrial Services has

12   submitted to the Court regarding the defendant's noncompliance

13   since commencing supervision on March 29, 2019.  Pretrial

14   Services is highly concerned about the incident on April 23,

15   2021, as the defendant deliberately attempted to evade

16   identification by using an alias name.  The defendant has been

17   referred to all necessary services, i.e. mental health and

18   substance abuse treatment, to mitigate his illegal drug use and

19   mental health concerns while under supervision.

20   Notwithstanding, he is under the most restrictive pretrial

21   conditions that can be imposed by the Court and has been given

22   numerous opportunities to comply with the conditions of

23   release, yet he continues to violate the former."

24             And the memo goes on just to reflect the request for

25   revocation and to state that the memo was being furnished to

L4QACELCps

1    counsel for both sides.  I first received the memo, as I said,

2    you know, about an hour to an hour and a half before this

3    conference.  Let me confirm, just first, that each counsel

4    received the memo.  AUSA Karamigios?

5              MS. KARAMIGIOS:  Yes, I did, your Honor.

6              THE COURT:  Mr. Silverman.

7              MR. SILVERMAN:  Yes, your Honor, approximately an hour

8    before we started.

9              THE COURT:  All right.  I think I have no choice but

10   to inquire of counsel as to their views.  Government?

11             MS. KARAMIGIOS:  Your Honor?

12             THE COURT:  Yes.

13             MS. KARAMIGIOS:  May I just clarify one of the

14   statements in the pretrial officer's report?

15             THE COURT:  Sure.  You're in an unusual position as to

16   this discreet episode of a fact witness.  Yes, you may.

17             MS. KARAMIGIOS:  The recitation is largely accurate.

18   I would just like to clarify that I didn't identify his voice

19   based on any past conversations.  I had never had any

20   conversations with Mr. Celli before.  What I did -- I suspected

21   that it was him just based on the nature of the phone call, and

22   I've obviously heard his voice at status conferences, so I just

23   wanted to clear up that I had been speaking to him otherwise.

24             THE COURT:  OK.  That's important.  And I see

25   Mr. Celli nodding in agreement with what you just said.  To be

L4QACELCps

1   clear, though, you felt that not just from context but the

2   voice timbre; the nature of the voice appeared similar to you

3   from what you've heard in Court.

4           MS. KARAMIGIOS:  Yes, your Honor.

5           THE COURT:  Thank you for the clarification.  Much

6   appreciated.

7           With that, does the government have a view on this

8   issue?

9           MS. KARAMIGIOS:  With that, your Honor, the government

10  also takes the conduct very seriously.  I'm in a bit of an

11  awkward position.  And so the government isn't taking any

12  position on the whether bail should be revoked in deference to

13  pretrial services.

14          THE COURT:  All right.  Thank you for your candor

15  about that and for your intellectual honesty about the awkward

16  situation that you are placed in.  May I ask you if anyone else

17  in your office has had time to consider the question.

18          MS. KARAMIGIOS:  No, your Honor.  Nobody else from my

19  office has weighed in on revocation.

20          THE COURT:  Did you report to anyone else in your

21  office what you believed had happened?

22          MS. KARAMIGIOS:  I did.  I let my second seat, Ms.

23  Sasso, know and my supervisor Nadia Shihata.

24          THE COURT:  OK.  But I take it, at whatever level

25  within the office a decision like this would be made --

L4QACELCps

1    presumably it might not be you, given that you're a percipient

2    witness to it -- nobody in the office has made a determination

3    as to what the office's view is on this.

4             MS. KARAMIGIOS:  That's correct, your Honor.

5             THE COURT:  Mr. Silverman, I have some questions that

6    I would like to put to the government, but I think probably the

7    most orderly thing to do is to hear your view.

8             MR. SILVERMAN:  Thank you, your Honor.  Obviously this

9    is unfortunate.  I would note the context of it.  There were a

10   lot of violations for a long time in this case, particularly if

11   you know that Mr. Celli was in jail for nearly five months.

12   Then you have seven violations very quickly over an 18-month

13   period.  This is the first similar violation since August.  The

14   October violation was for cocaine use.  But it's been eight

15   months since something similar has happened.  I think this is

16   pretty clearly the product of a serious mental health issue for

17   which Mr. Celli is receiving treatment, and much as we often

18   see with people who have alcohol and substance abuse

19   treatments, relapses are part of the process.  That doesn't

20   excuse it.  That doesn't make it OK.  But it has been a long

21   time since something like this happened.  And I think that

22   that's significant.

23             In terms of a remand right now, we're three weeks away

24   from a trial date that we expect to hold.  Mr. Celli and I need

25   to work together.  If he were to be remanded, it would be quite

L4QACELCps

1    difficult with the present rules at the MCC, to work with him

2    to prepare for trial.

3         I also note that Mr. Celli has his second vaccine shot

4    appointment on May 7.  Mr. Celli is obese, diabetic and has

5    HIV.  It's very important, I believe, that he be fully

6    vaccinated by the time we're in the courtroom for trial.

7         I spoke with Ms. Karamigios about some of this on

8    Friday evening.  And I learned more of this today.  After I

9    spoke with Ms. Karamigios on Friday, I spoke -- Ms. Silverman

10   and I spoke with Mr. Celli and his mother.  His mother is

11   listed at a second-party custodian on the bond and sometimes

12   they call it a third-party custodian, but she understands that

13   this has to be closely monitored and she is going to take

14   further responsibility for monitoring that as well.

15        But I would say, in summary, this is unfortunate, it's

16   something that shouldn't happen, and it has been a while, but I

17   think remand is a very extreme request.

18        I would also just note as a technical matter it's

19   unclear, it's always been unclear to me how much of this is

20   really a term of bail.  I mean, I think certain things are

21   clear in the September 2020 conference that Judge Donnelly told

22   Mr. Celli not to call AUSA Kayla Bensing.  Whether or not

23   that's a bail restriction is unclear to me.  But we're not

24   arguing that this is something that should have happened or

25   that is OK to happen, but given the long period of time since

L4QACELCps

1    it happened, given Mr. Celli's willingness to engage in

2    treatment that has been partly successful, and given the need

3    for to us work together as we approach a trial date, we

4    respectfully submit that remand would be inappropriate at this

5    time.

6              THE COURT:  Apart from your -- thank you.  Apart from

7    your obtaining the commitment, I gather, of Mr. Celli's mother

8    to be extra close in her supervision of Mr. Celli, is there any

9    steps short of remand that can be taken to minimize whatever

10   risk there is of continued noncompliance?

11             MR. SILVERMAN:  I haven't spoken about this with the

12   government, and I haven't spoken about this with my client, but

13   it's certainly possible to add a phone-monitoring provision.

14   That's an ex-post-type thing.  You know, it doesn't -- it's not

15   a preempt.  I suppose that I could promise as counsel to work

16   with Mr. Celli's mother if it's his cellphone through a call

17   blocking so that the phone can't make phone calls to the United

18   States Attorney's Office.  I can definitely investigate the

19   possibility of doing that with Mr. Celli's mother.  And I think

20   that that's akin to, you know, somebody stopping drinking once

21   you get the alcohol out of the house and putting things in

22   place to protect people from the things that they do to harm

23   themselves that they don't necessarily want to do in their

24   best, most level kind of moments.  So we can investigate that.

25             THE COURT:  Sure.  Thank you.

L4QACELCps

1          All right.  Thank you.  Very helpful -- and

2    thoughtful, characteristically thoughtful response, which

3    wrought to bear certain facts that I hadn't quite focused on.

4    That was very useful.  Thank you.

5          Let me ask government counsel -- and I appreciate the

6    government is not taking a position on the request --

7    Mr. Silverman raised a question that was on my mind as well.

8    Strictly speaking, there is a bail statute here that governs

9    remand.  And the issue is whether there are conditions that can

10   guard against, reasonably guard against flight and protect the

11   community.  This is not a presumption case.  In other words,

12   the government bears the burden as to each element.  Correct?

13          MS. KARAMIGIOS:  Yes, your Honor.

14          THE COURT:  And that means for danger to the community

15   it's not really by a preponderance but it's by clear and

16   convincing.

17          MS. KARAMIGIOS:  Yes, your Honor.

18          THE COURT:  Fully appreciating that the evidence here

19   may make a recurrence of this conduct something that could be

20   found by a preponderance or may be a clear and convincing

21   evidence, why does the recurrence of the conduct show either a

22   risk of flight or danger to the community, let alone by a

23   relevant standards?

24          MS. KARAMIGIOS:  I think the argument would be, your

25   Honor, that his inability and unwillingness to comply with his

L4QACELCps

1    conditions of release are evidence that he could be a danger to

2    the community and that his behavior might continue to escalate

3    to the point where we need to take actions in furtherance of

4    the violation.

5            THE COURT:  May I ask you if -- I don't mean to pry

6    too deep into plea discussions or discussions about a deferred-

7    prosecution agreement -- was there any recent event or

8    provocation leading up to April 23rd that might have -- that

9    might explain what happened?

10           MS. KARAMIGIOS:  Not to my knowledge, your Honor.  We

11   have been in discussions about disposition of the case.  No

12   formal decision has been made by my office yet.

13           THE COURT:  Mr. Celli did not, in other words, at

14   least to your knowledge or from the U.S. Attorney's Office,

15   receive bad news.

16           MS. KARAMIGIOS:  No, your Honor.

17           THE COURT:  Mr. Silverman, can you orient what

18   happened on April 23rd in connection with any other event?  I'm

19   trying to in effect understand, because I share your assessment

20   that Mr. Celli has made some form of progress during the course

21   of the prosecution, one of the questions is, how come this

22   lapse now?

23           MR. SILVERMAN:  I think, your Honor, we're looking at

24   the stresses of leading up to a trial situation where --

25   Mr. Celli is reminding me and this is exactly where I'm

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L4QACELCps

1   going -- that he has had the medication increase, including his

2   anxiety medications, over the past ten days.  So the meds have

3   been increased.  And he has experienced -- he was already

4   dealing with mental health challenges, and now they're being

5   compounded, of which anxiety was an element.  And now they're

6   being compounded by the anxiety that all people feel as they

7   approach a trial date.  And it wasn't handled gracefully.  But

8   I think that that's probably what led to this, is stress and

9   anxiety about going to trial.  Mr. Celli has had his meds up.

10  Although he was not facing the increased medication at the time

11  that this happened, he is now taking more.  And I don't -- I

12  did not use correct technical term, but, you know, finding the

13  right medication and combination is an ongoing work with

14  Mr. Celli and his doctors.  And so I think that's a lot of

15  what's going on.

16          And as your Honor points out, I don't think anyone

17  seriously thinks that Mr. Celli is a risk of flight.  He knew

18  on Friday that there was going to be a violation memo.  He was

19  here on time today, in fact quite early.  He has come to court

20  before safety and violation memos seeking remand.  He has never

21  fled.  As far as I know, there's nothing, been anything like

22  that.

23          In terms of danger, I do think your Honor is right to

24  contextualize.  The danger here is nuisance danger.  Mr. Celli,

25  as far as I know, has never done anything that's considered a

L4QACELCps

1    proximate physical threat.  And so that doesn't minimize --
2    that's not to minimize what happened.  We acknowledge, this
3    could not have happened, this could not happen, it cannot
4    happen, ought not happen.  But I think it's an interesting
5    point your Honor raises:  What is danger under the statute?  We
6    all sort of normally intuit it as risk of harm to others,
7    street violence or other things that people can do that are
8    dangerous.  Here, the risk that we're talking about is nuisance
9    behavior.  I do think that's an appropriate context.  But we
10   acknowledge it should not happen and cannot continue.

11         THE COURT:  Well, there are two categories of danger,
12   both of which go beyond nuisance.  And one is that other
13   statements that fit within the statute may be made.  And if
14   that were to happen, even if there was an intention to carry it
15   out, the threat itself is understandably identified as a crime.
16   It causes alarm, it causes disruption, it causes tumult.

17         The second danger would be the one that you've
18   identified, which is that lying behind a threat is a desire to
19   act on the threat, to carry it out.  And I take your point
20   that -- I'll ask the government about this at this point --
21   that from your perspective, there's no evidence that suggested
22   a desire to actually carry out the stated threats in the
23   communications at issue in this case.

24         MR. SILVERMAN:  Your Honor, I agree with the second
25   point.  I would just point out, in terms of all the bail

L4QACELCps

1    violations -- I was skimming through the prior memos on my

2    phone shortly before Court -- it would -- I'm not aware of

3    anything even approaching threat-level statements while on

4    bail.  I think what's in the present report is that Mr. Celli

5    asked for a fax number.  I don't have any reason -- and I say

6    this with complete honesty.  I really have no reason to believe

7    that whatever he might have faxed would have been threatening

8    in nature.

9            And so I just don't see anything suggesting even a

10   possibility of that kind of a risk of danger, that he would

11   engage in conduct violative of 875(c).

12           THE COURT:  Have you any insight as to what the facts

13   might have been that Mr. Celli had in mind?

14           MR. SILVERMAN:  I may, your Honor, but I would feel --

15   it wasn't communicated, it was properly not communicated.

16   Based on my understanding of what it was, it would certainly

17   not have been in the nature of a violation of 875(c) or

18   anywhere near that.  It would have been more in the nature of

19   things that have been submitted to this Court, both public a

20   under seal.

21           THE COURT:  OK.  And I take it understandably

22   Mr. Silverman, any knowledge you have is based on

23   attorney-client communications, and so I think what you're

24   trying to do is respect those communications while conveying to

25   me that any such communication would have been in the nature of

L4QACELCps

1    relitigation of past civil events, or something of that --

2              MR. SILVERMAN:  It would have been something -- yes,

3    your Honor.  It would have been something of a nature that is

4    far from a threat.

5              THE COURT:  OK.

6              Ms. Karamigios, is the government aware of any

7    evidence, beyond the face of the threats themselves, which is

8    not insubstantial, but is the government aware of any evidence

9    that would indicate an inclination to carry out a threat?

10             MS. KARAMIGIOS:  No, your Honor.  There is no evidence

11   that he, for example, got in the car and started driving

12   towards one of the judges' homes in this case.  The only thing

13   that I could point to is that he did send an email saying

14   something along the lines of -- and this has been produced in

15   discovery -- making a threat and acting on it isn't frivolous,

16   or something along those lines.  So he had threatened to act on

17   it, but we don't have affirmative evidence that he took steps

18   to act on it.

19             THE COURT:  All right.  Is there anything further that

20   you would like to, the government would like to bring to my

21   attention?

22             MS. KARAMIGIOS:  No, your Honor.  I would just note

23   that the phone restriction does sound appealing.  There are

24   other people that he is not suppose be to be calling beyond the

25   United States Attorney's Office.  And so to the extent that

L4QACELCps

1    that could also apply to judges and clerk's offices, that would
2    be wise.
3          I'd also ask -- I don't know if counsel has any idea
4    about it at this point -- but if counseling could be increased,
5    just something to address the recent violation.
6          THE COURT:  OK.  That's helpful.
7          Look, I do think both of the things that AUSA
8    Karamigios has suggested are sensible.  I will ask
9    Mr. Silverman in conjunction with the pretrial officer to take
10   steps to neutralize Mr. Celli's phone's ability to contact not
11   really the representatives of the U.S. Attorney's Office, but
12   if there are other people within the scope of the concern here,
13   including, for example, judges, I think that would be well
14   worth it.  So I will ask, and I know that the pretrial officers
15   are on the phone, that steps be put in place to limit the
16   ability of Mr. Celli's phone to contact people, including the
17   prosecutors and judges.  If there are others who are within
18   scope, Ms. Karamigios, I'd be happy to know, but I take it
19   that's really what you're concern was.
20         MS. KARAMIGIOS:  Yes, and the Clerk's Office, your
21   Honor.
22         THE COURT:  And the Clerk's Office.  I will ask
23   Mr. Silverman and Ms. Karamigios to formulate the precise words
24   that capture this directive so as to make sure to take up the
25   names of the relevant parties, but I take it it would be three

L4QACELCps

1  categories: judges, AUSAs, and the Clerk's Office.

2              I think that's well worth it.  I think, Mr. Silverman,

3  your analogy to the alcohol context is right.  It doesn't

4  prevent the problem from happening, but it makes it a little

5  harder to reach.

6              MR. SILVERMAN:  Yes, your Honor.  We will endeavor to

7  do it as quickly as possible.

8              THE COURT:  And, look, the second thing that I will

9  ask is that the Pretrial Services explore whether there is

10  intensified counseling available that could be furnished to

11  Mr. Celli.

12             I can't at this point think of other steps that are

13  likely, nor have counsel identified, that are likely to

14  meaningfully reduce the risk of a recurrence of that behavior.

15  If, however, on reflection, because these events just happened,

16  anyone can think of any other steps, I'm more than happy to

17  consider them.  But on the big picture, here is my assessment.

18  And, Mr. Celli, I'll ask you to take a look at me while I

19  speak.

20             What you did was gravely wrongful.  Given the context

21  of this case, even an outreach to the prosecutor, somebody who

22  you've been prohibited from calling, is apt to cause alarm,

23  even if the words you chose were just words about using a fax

24  machine.  For better or worse, you stand accused of making

25  death threats to federal judges.  It's not a surprise that if

L4QACELCps

1   somebody else that you were precluded from reaching out to then

2   received a prohibited communication from you, their fears,

3   understandably, would run towards the very worst of what you

4   might have in mind.  So your behavior, in the context of what

5   you've been charged with, causes alarm.  You can't do that.

6   And it's self-defeating to do it, too.

7           Right now, you have not been adjudicated guilty of the

8   offenses to which you have been charged.  And I can't foresee

9   the future and I don't know the direction the case will go in.

10  I don't know whether a pretrial disposition will be reached.  I

11  don't know if it was, what the terms was reached.  I don't know

12  what the terms would be.  And I don't know, if there is no

13  pretrial disposition reached, if you went to trial, what the

14  likelihood is that you would be found guilty.  But I can say

15  this.  If either by guilty plea or by conviction, you are

16  adjudicated guilty of the offense, one day I would be in the

17  position of having the duty to impose sentence on you.  It's

18  something that I regrettably have to do a great deal in my line

19  of work.  One of the things that the judge is always looking at

20  is the recent behavior of the defendant.  The question in the

21  judge's mind is:  Does he get it now?  Has the arrest or the

22  charge been a shock to the system?  Has it been a wake-up call?

23  Is the defendant now complying with the rule of law, or is the

24  defendant violated?  And in that respect, when a defendant

25  repeatedly violates conditions of release, even if the

L4QACELCps

```
 1    violations themselves are not crimes, it's concerning.  It
 2    suggests that a defendant can't quite comply with the law.  And
 3    that makes you worry more about what bad things can happen if
 4    the defendant were at liberty.  That makes you think, as a
 5    judge, maybe a somewhat longer sentence is needed to get a
 6    message across to the defendant.
 7            So ultimately, whatever led you to reach out to the
 8    AUSA on Friday, it's ultimately self-defeating.  If you find
 9    yourself in the position of facing sentence, you want to be
10    able to persuade the Court that you are a more calm, compliant,
11    respectful-of-law person.  And this is a bad walk-in.  It
12    disserves you.  So both because it's inherently an alarming
13    thing in the context of this case and because it's harmful to
14    you, please don't do it.  You just can't do that.
15            And I will tell you as well that, although I'm denying
16    the request for you to be remanded, with each violation, the
17    argument for a remand becomes stronger.
18            I'm ultimately denying the application for remand, for
19    principally the reasons that Mr. Silverman articulately set
20    out.  There is a mismatch between what you've done so far and
21    the requirements of the statute.  There's no reason to think
22    that you're a risk of flight.  On the contrary, I admire the
23    fact that you have time and again shown up and been on time.
24    That's not your problem.  I don't find any basis to think that
25    you are a risk of flight.
```

L4QACELCps

1          As to the danger to the community, that's a more

2     substantial question, because the threats are themselves a form

3     of danger, and the noncompliance now presents a little bit of

4     greater risk.  With each time, with each additional violation,

5     the perceived risk grows that there might be more threats or

6     even possibly, although there's no specific evidence, that you

7     might actually one day take a step in the direction of acting

8     out those threats.  I don't find that yet.  But the

9     noncompliance is worrisome.

10         And I have to say, I was just on a personal level

11    disappointed because I have had been proud of you.  You have

12    been pulling it together more during the time that you've been

13    before me than, I think, beforehand.  And I think

14    Mr. Silverman's chronicling of the statistics reflected that

15    whatever the cause was, although you hadn't gotten it exactly

16    right, you've been better.  And you should feel proud of that.

17    And that's the kind of look you want to be presenting.

18         So at the end of the day I can't find that there is

19    clear and convincing evidence that you were a danger to this

20    community.  But you're closer to that than you were on

21    Thursday.  And if you do something like this again you'll be

22    closer and you might cross that line.  So don't do it.

23         Understood?

24         THE DEFENDANT:  I appreciate what you just said, your

25    Honor.  And like my letter would have been -- I apologize to

L4QACELCps

1   Ms. Karamigios.

2            THE COURT:  OK.  Thank you.  Look.  Thank you.  I'm

3   sure Ms. Karamigios appreciates the apology.  So do I.  The key

4   is to walk the talk.

5            OK.  All right.

6            Look, although it isn't strictly relevant to the

7   standard of danger to the community, risk of flight, the very

8   common-sense arguments that Mr. Silverman makes also reinforce

9   the conclusion.  I want you to get your second COVID shot.  And

10  if the case is destined to go to trial, I want you to have easy

11  access with your counsel, who is the best thing to come into

12  your life in a long time.  And so I want you to have those

13  advantages.  And so while that's not driving the decision here,

14  it is consistent with the decision here.

15           OK, Mr. Celli?

16           THE DEFENDANT:  Yes.

17           THE COURT:  All right.  Let's not -- please don't put

18  me in a position of being in this situation again.

19           All right.

20           With that, I think that covers the agenda I had for

21  today.  We have next week, next Wednesday, a walk-through, at

22  which point Mr. Smallman, my staff and I, will be learning

23  about the space in the Eastern District and in particular the

24  COVID restrictions that govern.  We've been checking that out

25  in the context of the Southern District just to make sure we're

L4QACELCps

1    issue-spotting matters large and small, including where people

2    stand, who can move where, use of common microphones, timing of

3    egress and entry into the courtrooms, and a whole host of

4    issues.  And once we have left the Eastern District next

5    Wednesday I'll have a better understanding of all that, and

6    Mr. Smallman will be in touch with all of you to set up a date

7    that will be a final walk-through for all of you where we can

8    essentially work together to make sure that, collectively,

9    everyone understands what the COVID protocols in particular

10   are.  And we'll use that as well as a final pretrial

11   conference.  I would expect that at that conference I will be

12   engaging with you in resolving any issues with respect to the

13   evidentiary use of or arguments upon the civil case.

14             MS. KARAMIGIOS:  Yes, your Honor.

15             THE COURT:  With that, Ms. Karamigios, is there

16   anything else to raise today?

17             MS. KARAMIGIOS:  No, your Honor.

18             THE COURT:  Mr. Silverman?

19             MR. SILVERMAN:  No, your Honor.  Thank you.

20             THE COURT:  And may I ask, Ms. Karamigios, again

21   without holding you to it and without prying, do you have a --

22   is there anything to report, even at the level of decision

23   date, when we will know whether this is -- whether a pretrial

24   disposition has been worked out?

25             MS. KARAMIGIOS:  I would expect in the next few days,

L4QACELCps

1    your Honor.

2           THE COURT:  OK.  Please let my chambers know one way

3    or the other.  It affects a lot of things.

4           MS. KARAMIGIOS:  Very good, your Honor.

5           THE COURT:  Very well.  We stand adjourned.

6           MS. KARAMIGIOS:  Thank you, your Honor.

7           (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25